**CARGILL, Inc., et al. v. UNITED STATES et al.**

**INLAND WATERWAYS CORPORATION v. SAME.**

**Nos. 3714, 3725.**

District Court, N. D. Illinois, E. D.

April 16, 1942.

Luther M. Walter, John S. Burchmore, Robert N. Burchmore, and Nuel D. Belnap, all of Chicago, Ill. (Walter Burchmore & Belnap, of Chicago, Ill., of counsel), for plaintiff Cargill, Inc.

Nuel D. Belnap and Robert N. Burchmore, both of Chicago, Ill. (Walter, Burchmore & Belnap, of Chicago, Ill., of counsel), for plaintiff Inland Waterways Corp.

Leo P. Day, of Chicago, Ill., for defendant New York Central System.

Horace L. Walker, of Richmond, Va., and Bryce L. Hamilton, of Chicago, Ill., for defendant N. Y. C. & St. L. R. Co.

R. S. Brittingham, Jr., Sp. Asst. to Atty. Gen., Daniel H. Kunkel, of Washington, D. C., Atty. Interstate Commerce Commission, J. Albert Woll, U. S. Dist. Atty., of Chicago, Ill., for defendant U. S.

Frank H. Cole, Jr., of Cincinnati, Ohio, Erich W. Lademann, of Chicago, Ill., for defendant B. & O. R. R. Co.

Clyde E. Shorey, of Chicago, Ill., for defendant Erie R. R.

Theodore Schmidt and George F. Dyche, both of Chicago, Ill., for defendant Penn. R. Co.

Horace L. Walker, of Richmond, Va., and William G. Wise, of Chicago, Ill., for defendant C. & O. Ry. Co.

Kremer, Branand & Hayes, of Chicago, Ill., for intervenors A. L. Mechling, doing business as A. L. Mechling Barge Line.

Haskell Donoho, Senior Atty. U. S. Department of Agriculture, of Washington, D. C., for intervenor Secretary of Agriculture.

Mastin G. White, Sol. U. S. Department of Agriculture, of Washington, D. C., and A. B. Enoch, of Chicago, Ill., for intervenor Alton R. Co.

Before EVANS, Circuit Judge, and WOODWARD and HOLLY, District Judges.

WOODWARD, District Judge.

This cause coming on to be heard and the Court having heard arguments of counsel, and being fully advised in the premises, now makes the following findings of fact:

(1) Presently, and for many years, trunk line railroads operating to the east from Chicago, Illinois, including the carrier defendants herein, have maintained therefrom to eastern destinations proportional or reshipping rates on grain and grain products (hereinafter referred to as grain), in carloads, which are and were lower than the local rates on the same commodities from and to the same points. As a representative example, to New York City, New York, the proportional or reshipping rate is 26 cents per hundred pounds and the local rate is 34.5 per hundred pounds. To destinations east of Buffalo and Pittsburgh the trunk line railroads maintain similar rates, although differing in amounts, all of said rates exhibiting a similar difference of 8.5 cents per hundred pounds between the proportional or reshipping rates, on the one hand, and local rates, on the other. Such proportional or reshipping rates apply upon reshipment from Chicago to grain received at Chicago over any route via a rail or a water transportation line from any origin, from whence the inbound interstate rate via railroad is 8.5 cents per hundred pounds or greater, provided the reshipment takes place within a year after the grain is received at Chicago, and further provided that the billing of the inbound carriers, which is treated as representative of the grain, is recorded with the railroads and is cancelled at the time the grain represented thereby is reshipped. To destinations to the east of Chicago and intermediate to Chicago and Pittsburgh, proportional and reshipping rates lower than local rates are and were also provided. However, to such destinations there were and are three different levels of proportional or reshipping rates, one termed Trans-Mississippi, another Northwest, and another Reshipping. As to grain received at Chicago via rail and reshipped therefrom to said destinations, the application of the Trans-Mississippi, the Northwest, or the Reshipping Proportional or reshipping rate is dependent upon the origin from whence grain moved inbound to Chicago via rail. As to grain received at Chicago via a water transportation line, the Northwest proportional or reshipping rate is applicable, regardless of the origin and regardless of the route of the inbound movement. The local rates of the eastern trunk lines from Chicago to eastern destinations apply on all grain shipped via rail to which the proportional or reshipping rates above described do not by their terms apply.

(2) Grain presently entitled to the proportional or reshipping rates arrives at Chicago via three different characters of transportation services, i.e., (1) via rail; (2) via barge over the Illinois River and connecting waterways and rivers; and (3) via lake steamer over the Great Lakes. The terms "ex-rail", "ex-barge", and "ex-lake" are used as referring to grain received via the respective means just stated, and also to grain that is reshipped upon the cancellation of the ex-rail ex-barge, and ex-lake inbound billing.

(3) Little or no grain moves into and out of Chicago in continuous through movement. Rather, the inbound service via rail, via barge, or via lake steamer comes to an end by delivery of the grain into an elevator at Chicago, title to the grain commonly passing to a purchaser at that point, and the outbound reshipment comes later as an independent transaction.

(4) The Inland Waterways Corporation, operating the Federal Barge Lines, plain-

tiff in No. 3725, operates a barge line as a common carrier by water in interstate commerce on the Illinois waterways and the Mississippi and Missouri Rivers, and has heretofore transported ex-barge grain to Chicago, which ex-barge grain has been reshipped therefrom at the proportional or reshipping rates above described.

(5) Cargill, Incorporated, Norris Grain Company, Rosenbaum Brothers, Santa Fe Elevator Corporation, and Continental Grain Company, plaintiffs in No. 3714, each operates a general grain business and public elevators at Chicago. In the course of that business, they buy grain received via rail, via barge, and via lake on the basis of prices delivered Chicago, store that grain in public elevators awaiting sale, and subsequently sell and reship such grain via lake and via rail for consumption in eastern territory.

A. L. Mechling, doing business as A. L. Mechling Barge Lines, his position being the same as that of the Inland Waterways and the Secretary of Agriculture, intervened both before the Interstate Commerce Commission and in this Court.

(6) The purchase of grain by the plaintiffs in No. 3714 at Chicago on a delivered price basis results in imposing on the shipper of the grain the cost incurred in connection with the inbound transportation; and when a particular mode of transportation provides a saving in transportation costs as against some other mode of transportation, that saving accrues to the inbound shipper.

(7) Two of the plaintiffs in No. 3714, i.e., Continental Grain Company and Norris Grain Company, operate elevators on the banks of the Illinois waterways, some of which have no facilities for rail shipments. These plaintiffs accumulate grain at such elevators for shipment to Chicago via barge with a view to storage at that point and subsequent merchandising and reshipment.

(8) The Baltimore and Ohio Railroad Company, Erie Railroad, the New York Central Railroad Company, the New York, Chicago and St. Louis Railroad Company, the Pennsylvania Railroad Company, and the Chesapeake and Ohio Railway Company, carrier defendants in the above-entitled causes, are among the eastern trunk lines which maintain the proportional or reshipping rates and the local rates above described.

(9) By tariffs filed with the Interstate Commerce Commission to become effective October 15, 1939, the carrier defendants and others propose to change their existing tariffs so as to make the above-described proportional or reshipping rates maintained by them inapplicable on the reshipment of grain arriving at Chicago via the Illinois waterways, the proposal being to continue the application of such proportional or reshipping rates on ex-rail and ex-lake grain. The plaintiffs in these causes, with others, protested this change in rate application on the ground that it would result in rates which would be unreasonable in violation of Section 1 of the Interstate Commerce Act, 49 U.S.C.A. § 1, unjustly discriminatory in violation of Section 2 of said Act, unduly prejudicial and preferential in violation of Section 3(1) of said Act, and unlawfully discriminatory as between defendants' connecting lines in violation of Section 3(4) thereof. Responsive to such protests, the Commission by order of October 14, 1939, suspended the proposed change in rates and instituted an investigation into the lawfulness thereof in a proceeding before it entitled I. & S. Docket No. 4718, Grain Proportionals, Ex-Barge to Official Territory. By the order mentioned, the change was suspended until May 15, 1940. The investigation proceedings were not, however, concluded at that time and the defendant carriers voluntarily postponed the effective date of the proposed change until the Commission could conclude its investigation and enter an appropriate order, and to date no change has been made in said rates.

(10) After hearings in said investigation and suspension proceeding, in which the plaintiffs participated as parties thereto, the Commission, by Division 2, issued its report and order of July 31, 1941, officially reported in 246 I.C.C. 353, 381. In that report and order, the Commission concluded that no change in rates would in fact be produced by the suspended tariff schedules, this on the stated ground that the existing tariff schedules did not make legal provision for the application of proportional or reshipping rates to ex-barge grain. Consistent with that theory of the case, Division 2 entered a conclusion reading: "We conclude that the proportional rates here in issue have never been applicable on this barge traffic moving on unfiled rates, and find that the schedules under suspension are not shown to be

unlawful. An order will be entered vacating the order of suspension, and discontinuing this proceeding."

Pursuant to the finding just quoted, Division 2 of the Commission entered an order vacating and setting aside, as of August 30, 1941, the order of investigation and suspension.

(11) Prior to the effective date of that order, the plaintiffs in No. 3714 filed with the Commission a petition for reconsideration and reargument, and the plaintiff in No. 3725 filed with the Commission a petition for reconsideration, rehearing and reargument, and the Commission postponed the effective date of its order pending action on said petitions.

(12) By report on consideration and order of December 1, 1941, the Commission granted reconsideration and denied reargument and rehearing. In that report on reconsideration, it reversed the prior finding that the proposed tariff schedules did not provide a change in rates, and, in lieu thereof, found that the proportional rates in issue were and had been legally applicable to ex-barge traffic when certain so-called policing provisions in the tariffs had been complied with.

(13) In its report on reconsideration, the Commission found, upon the merits of the case, as follows:

"The facts of record as detailed by the division and summarized herein, clearly show that respondents are justified under section 1 in treating the ex-barge traffic the same as local or ex-truck traffic and that the proposed schedules cannot be condemned as unlawful under sections 2 and 3 of the act.

"On reconsideration of the record in the light of the petitions and replies thereto and our prior decisions, we find that:

&ast; &ast; &ast; &ast; &ast;

"(2) The proposed schedules are shown to be just and reasonable and are not shown to be otherwise unlawful.

"The prior findings, 246 I.C.C. 353, are modified and clarified accordingly. The above enumerated petitions are denied in all other respects.

"An appropriate order vacating the order of suspension and discontinuing the proceeding will be entered."

And, pursuant to said findings, entered an order vacating and setting aside, as of December 22, 1941, the order originally entered instituting the proceeding, and discontinued the proceeding. Subsequently, the effective date of said order of December 1, 1941, was by orders extended to February 22, 1942.

(14) As preliminary to its ultimate conclusion, the Commission, in its report on reconsideration, found that it would take official notice of the fact that the Federal Barge Lines, and certain other barge lines, had filed their port-to-port grain rates with the Commission since the hearing in the cases, and also found:

"To Chicago, the inbound barge rates range from 2.75 to 4.5 cents for hauls ranging from 57.5 to 200.9 miles, as contrasted with the inbound interstate rail rates ranging from 9.5 to 13 cents. Rates are stated in cents per 100 pounds. The proposed schedules will result in increases in the barge-rail combinations ranging from 1.5 to 7.5 cents to central territory and in a uniform increase of 8.5 cents to trunk-line territory. The proposed ex-barge rates, which are the same as the local rates, range from 17.3 to 25.7 per cent of first class and are substantially below the level of the sixth-class rates (27.5 per cent of first class) which has been prescribed or approved as a reasonable maximum basis in official territory.

"To central territory, the barge-rail combinations, even under the proposed schedules, will still be generally lower than the all-rail rates. From Morris, Ill., a representative origin, via Chicago, to Indianapolis, Ind., Detroit, Mich., and Circleville, Ohio, the barge-rail combinations will be 1.75, 4.75 and 0.75 cents, respectively, lower than the all-rail rates.

"To trunk-line territory, the inbound barge movement represents a very small proportion of the total haul. The distance from Morris to Chicago by river 57.5 miles, plus 880 miles rail short line to New York is 937.5 miles. The water portion of the haul is but 0.6 per cent. To this territory, the barge-rail combinations are far below the local rates from the reshipping points in contravention of the fourth-section rule, while the all-rail rates are in strict conformity with that rule. The present barge-rail combination from Morris via Chicago to New York is 28.75 cents (composed of the inbound barge rate of 2.75 cents plus the outbound proportional rail rate of 26 cents), or 5.75 cents lower than the 34.5 cent local rate from Chicago, while the all-rail rate from Morris is 35.5 cents (composed of the inbound interstate rail rate

of 9.5 cents plus the outbound rate of 26 cents), or one cent higher than the local rate from Chicago. Under the proposed schedules, the barge-rail combination from Morris to New York will be 37.25 cents (2.75 cents inbound plus 34.5 cents outbound), or 2.75 cents higher than the local rate from Chicago and only 1.75 cents higher than the all-rail rate.

"To central territory, the ex-rail proportional rates are made 3 cents higher from the Northwest than from trans-Mississippi territory so as to equalize the Twin Cities with Kansas City in connection with the inbound rail rates. The inbound haul in connection with the ex-lake traffic is from the head of the lakes or beyond and is much longer than in connection with the ex-barge traffic. The rail-lake-rail rates from the Northwest are therefore much higher than the local rates from Chicago or the barge-rail combinations and do not contravene fourth-section principles or jeopardize the all-rail rate structure.

"The proposed schedules will not prohibit the movement by barge-rail even to trunkline territory, their principal commercial effect being to reduce the profits of the Chicago elevator operators. Furthermore, these operators will still have the benefit of the outbound proportional rates where their inbound haul is by rail or lake and also the benefit of the outbound lake or lake-and-rail rates, irrespective of their inbound haul, and this is likewise true of the Illinois shippers where their inbound haul is by rail or barge, respectively.

"Protestants maintain that the proposed schedules will be unreasonable, unjustly discriminatory and unduly prejudicial against Chicago, the ex-barge traffic, shippers, elevator operators, and dealers interested in the ex-barge traffic, and the Federal Barge Lines as a connecting line, and unduly preferential in favor of other lake ports, ex-rail and ex-lake traffic and in favor of shippers, elevator operators and dealers interested in ex-rail and ex-lake traffic and respondents' connections by rail and lake. This is based primarily on the fact that under the proposed schedules the ex-barge rates will be higher than the ex-rail or ex-lake rates although in each instance the physical carriage beyond the reshipping point is substantially the same. But the latter is also true of local grain, grain brought in by truck, or by rail under intrastate rates, or grain which has for-feited its transit privileges. To adopt protestants' premise would mean that all proportional rates lower than local rates and differing from each other according to the origin of the commodity would have to be condemned. As pointed out by the division, reshipping or proportional rates are in their essence balances of through rates. Such balances are of course determined by the measure of the inbound and through rates and properly may vary according to the relative length and nature of the inbound and through service. It follows that the protestants' allegations cannot be sustained in this proceeding, although in a proper proceeding we might prescribe proportional rates on the ex-barge traffic lower than local rates or joint barge-and-rail rates lower than the combinations."

(15) The Commission made no finding in its report as to inbound barge rates on ex-barge grain from St. Louis and Kansas City, Missouri, or as to the movement of such ex-barge grain, although the facts as to such rates and such movement were contained in the record before it.

(16) The reference by the Commission to sixth-class rates (27.5 per cent of first class) as having been prescribed or approved as a maximum reasonable basis of rates on grain in official territory referred only to cases involving local rates on grain, and not to cases involving reshipping or proportional rates as applied to ex-rail or ex-water grain.

(17) The distance via barge from Morris, Illinois, to Chicago, mentioned by the Commission, is substantially the same as the distance via rail from and to the same points.

(18) There is no evidence in the record to support the finding of the Commission that the proposed schedules will not prohibit the movement by barge-rail, even to trunk-line territory. The Court finds as a fact upon the undisputed evidence that the basis on which grain is purchased delivered Chicago or delivered at a river bank elevator for barge movement to Chicago imposes all costs incurred on the inbound move on the producer of the grain; that any saving in inbound costs represented by the difference between the costs via barge and via rail accrues to the producer by way of higher net prices to him; that such saving does not accrue to the Chicago elevator operator so as to be available to him to offset a penalty in railroad rates east of Chicago; that ex-barge, ex-rail and ex-lake

grain of the same species and grade are not only purchased at the same price at any given time but are sold at the same price; that ex-barge, ex-rail, and ex-lake grain are sold at eastern destinations at prices named on a basis delivered at such destinations and such prices are directly predicated on the freight rate from Chicago to destination to which the grain is entitled under the tariffs; that the Chicago elevator operators received no greater profit per bushel in merchandising grain received via barge than in merchandising grain received via rail; that the grain business is done on a margin of a quarter of a cent per bushel, and a difference in price in that amount will affect a sale; that no grain has ever moved from Chicago to the east on the basis of the local rates via rail; that if the proposed tariffs become effective, ex-barge grain cannot be sold in competition with ex-rail and ex-lake grain for a rail movement to an eastern destination; that if the proposed tariffs become effective, ex-barge grain can move from Chicago only via the lake, and even that avenue of reshipment will not be available to ex-barge grain during the winter months in which navigation is closed on the Great Lakes; that the carrier defendants and other eastern railroads who propose the change did so in the expectation that the ex-barge grain would not move outbound from Chicago via rail; and that the purpose of said carriers in proposing the change was to drive the grain inbound to Chicago off of the water and onto the rails.

(19) The finding of the Commission to the effect that the physical carriage beyond the reshipping point is substantially the same for ex-barge, ex-rail, and ex-lake grain, is supported by the evidence.

(20) At the time of the hearing in the case by the Commission the proportional or reshipping rates in issue before the Commission did not constitute a portion of a through rate of which all factors were on file with the Commission, in so far as the movement of ex-barge and ex-lake grain is concerned.

(21) At the time of the report of the Commission on reconsideration in the case the proportional or reshipping rates which were in issue before the Commission did not constitute a portion of a through rate of which all factors were on file with the Commission, in so far as ex-barge and ex-lake grain moving to Chicago via private or contract carriers or in a tow exempt from regulation under Section 303(b) of Part III of the Interstate Commerce Act, 49 U.S.C.A. § 903(b), is concerned.

(22) The report of Division 2 of July 31, 1941, mentioned certain facts and matters which are not referred to in the report of the Commission on reconsideration of December 1, 1941. These include: the history of the Illinois waterways; the principal shipping points along the Illinois waterways and the distance range to Chicago, no mention being made, however, of St. Louis and Kansas City, Missouri, from which the evidence showed a movement of ex-barge grain; the volume of movement of grain moving in and out of Chicago via various modes of transportation; a description of the Illinois grain producing section and available water and rail facilities; a description of the published rail rates into Chicago, including some specially reduced intrastate rates on corn established to meet the competition of the barge lines for the inbound movement; the movement of corn into Chicago over the Illinois waterways; the barge line charges for movements from Illinois producing points to Chicago; the Board of Trade rules affecting the merchandising of grain and showing the penalty imposed on one who delivers under a future contract for rail movement, if such one is unable to accompany the delivery by inbound billing which will entitle the grain to be reshipped on the proportional or reshipping rates to the east; the Chicago elevator capacity; a comparison of barge and rail delivery costs at Chicago showing the increased net prices to the corn producer which are received when the inbound movement is by barge rather than by rail; the situation of inbound truck grain which is not now entitled to reshipment on the proportional or reshipping rates; the efforts of the western lines in meeting inbound barge competition; and a comparison of proportional or reshipping and local rates from Chicago to representative eastern destinations.

In addition, the report contains the following statements regarding a contention of those supporting the proposed change that the present adjustment has adversely affected the all-rail rate structure:

"The western lines, supported by the respondent eastern lines, also contend that if application of the proportional rates is to be continued on unregulated ex-barge traffic, the result will be a breaking down of the established through grain-rate structure

from West to East. The evidence already detailed with respect to the inability of the reduced intrastate rates on corn to accomplish their purpose in meeting the competitive barge charges supports this contention.

\* \* \* \* \*

"The proposed schedules not only contemplate clarification of the schedules, but also have the effect of maintaining the existing grain-rate structure, which has already been partially disrupted in the State of Illinois. See Corn Grits from Kankakee, Ill. to Battle Creek, Mich., 237 I. C. C. 413. If the ex-barge grain is permitted to continue to obtain the benefit of the proportional rates east of the rate-break points, that application will, because of fourth-section evasions, also disrupt the grain-rate structure as far east as Painesville and East Liverpool, Ohio, the latter being approximately 300 miles from Baltimore.

\* \* \* \* \*

"The application of the proportional rates here in issue on ex-barge grain has already broken down a portion of the Illinois grain-rate structure to Chicago, and an imminent break-down of the grain-rate structure east of Chicago is also indicated by the evidence. Tariffs on file here show that during the pendency of this proceeding the rates on corn have been substantially reduced within the State of Indiana, as well as from Indiana to Chicago and to certain stations in Ohio."

(23) The breakdown of the rail rate structure referred to by the Commission related to the publication by western lines of intrastate rail rates to Chicago below the normal basis of intrastate rates, and such publication was made in an effort to compete for the inbound haul of grain to Chicago.

(24) If the proposed rates become effective, ex-barge grain will pay a greater charge upon reshipment from Chicago to eastern destinations than will ex-rail or ex-lake grain, although the railroad services rendered east of Chicago will be identical upon the reshipment of grain in all three categories.

(25) If the proposed rates become effective, there will be less incentive than at present for a shipper to use barge service rather than rail service to Chicago from origins on the Illinois waterways and other rivers connecting therewith, and there will be less incentive for purchasers of grain at Chicago to purchase ex-barge grain.

(26) If the order of the Commission of December 1, 1941, becomes effective and the defendant carriers make the changes in rates and charges authorized thereby, the interests of grain producers now enjoying barge transportation into Chicago will be adversely affected.

(27) The natural transportation advantages enjoyed by producers of grain located near the Illinois River waterways does not enable them to. undersell other grain producers in the Chicago market. The grain of producers enjoying cheap water transportation is sold delivered at Chicago. The measure of the inbound rate has no effect upon the Chicago price; it only affects the net price to producers. Producers who cannot use water transportation are under no disadvantage whatsoever because of the transportation advantage of other farmers located upon the waterways.

(28) If the order, referred to above, becomes effective, there will be effected, to the extent of the territory involved, a nullification of a consistent national policy to further the improvement of inland waterways in order to provide economical transportation.

(29) The action of the Interstate Commerce Commission in the order, referred to above, is, in practical effect, an attempt to bring about a cartelization of barge and rail transportation, which, if consummated, would destroy competition between these two means of transportation.

(30) The Interstate Commerce Commission, acting by Division 4 thereof, and conformable to the Transportation Act of 1940, 49 U.S.C.A. § 1 et seq. (amending the Interstate Commerce Act), on November 6, 1941 made its findings and order, and pursuant thereto a Certificate of Public Convenience and Necessity was issued by the Interstate Commerce Commission to the Intervening Barge Line (A. L. Mechling, doing business as A. L. Mechling Barge Line). As more fully appears therefrom, the Intervening Barge Line is a certified common carrier by water subject to Part III engaged in carriage by barge only, between all points on the Illinois Waterway north of and including Havana, Illinois

(which includes Chicago), of all kinds of grain and soy beans. As also appears from said order of November 6, 1941, the intervening carrier transported soy beans and seven kinds of grain to Chicago, Illinois, in 1939, 1940 and 1941; shipments were also made to Pekin, Illinois, in 1939; after reaching destination the commodities generally continued movement by rail or water carriers to points in other states or foreign countries.

(31) The Interstate Commerce Commission took no evidence addressed to the issue whether the rate proposal in question is in violation of Section 3(4) of the Interstate Commerce Act, as amended by the Transportation Act of 1940, or contrary to the National Transportation Policy enacted by the last said act; but the Interstate Commerce Commission passed upon the legality of said rate proposal upon evidence taken without reference to such issues and before they existed.

(32) The intervening plaintiff sought to intervene in the proceedings before the Interstate Commerce Commission held by it for investigation of said rate proposal before its order approving said rate proposal became effective and to present evidence before the Interstate Commerce Commission addressed to the issues whether said rate proposal was illegal under the Interstate Commerce Act, as amended by the Transportation Act of 1940, and especially Section 3(4) thereof and the new National Transportation Policy, but the Interstate Commerce Commission refused to permit him to do so.

Upon the above and foregoing findings of fact, the Court states the following conclusions of law:

(1) The order of the Interstate Commerce Commission of December 1, 1941, is of a character which this Court is authorized to enjoin and set aside, and this Court has jurisdiction over the subject matter of the suits.

(2) Plaintiffs in the above-entitled causes have an interest and standing which entitles them to bring and maintain these suits.

(3) The carrier defendants were properly joined in these suits and the Court has jurisdiction over said carrier defendants.

(4) The order of the Interstate Commerce Commission discriminates against water competition by the users of barges.

(5) An injunction should issue as prayed for in the bill of complaint.