INTERSTATE COMMERCE COMMISSION *v.* MECHLING, DOING BUSINESS AS A. L. MECHLING BARGE LINE, ET AL.

No. 72. Argued February 12, 13, 1947.—Decided March 31, 1947.

568

*Daniel H. Kunkel* argued the cause for appellant. With him on the brief was *Daniel W. Knowlton.*

*David O. Mathews* argued the cause for the United States and the Secretary of Agriculture. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Berge, Edward Dumbauld, W. Carroll Hunter* and *James K. Knudsen.*

*Edward B. Hayes* argued the cause for Mechling, appellee.

*Nuel D. Belnap* argued the cause for the Inland Waterways Corporation, appellee. With him on the brief were *Luther M. Walter, John S. Burchmore* and *Robert N. Burchmore.*

MR. JUSTICE BLACK delivered the opinion of the Court.

A District Court of three judges enjoined in part an order of the Interstate Commerce Commission, and the case is here on appeal under 28 U. S. C. §§ 47, 47a, and 345. The Commission order specifically relates to the railroad rate for grain transported from Chicago, Illinois, to New York and other eastern points,[1] after that grain has been transported to Chicago from the west by connecting rail or water carriers on through bills of lading. In such through shipments the through rate is a combination of distinctly separate rates charged respectively for shipments from the west to Chicago and from Chicago to the east. The charge fixed for the last leg of the shipment is called, in railroad parlance, a "reshipping" or "proportional" rate. It is lower from Chicago to the east than a "local" rate charged for a shipment from Chicago to the east which originates in Chicago. See *Atchison, T. & S. F. R. Co.* v. *United States,* 279 U. S. 768, 771.

For many years eastern railroads have carried grain east from Chicago at reshipping rates 8½ cents per hundred pounds lower than local rates. Up to 1939 this Chicago-to-the-east reshipping rate had been identical for grain, whether brought to Chicago by a connecting railroad, connecting lake steamer, or connecting barge. Although barge lines were much slower than railroads, they were less expensive to operate and therefore could afford to transport freight much more cheaply than railroads. The result was that the barge-rail rate from a point in the west to eastern destinations was considerably cheaper

---

[1] The eastern points are in New York and adjacent states and in New England. It is around shipments from Chicago to this territory that this rate controversy chiefly revolves. The proposed new rate increases also related to grain shipments from Chicago to the so-called central territory. The reasons supporting the conclusion we reach apply equally to the central territory increases, and consequently we need not treat them separately.

than the all-rail rate from that point—the difference being measured by the relative cheapness of shipping over the barge leg of the through route. Because of the cheaper barge rates, much of the railroads' grain freight business from localities which could be served by either barge or rail shifted to the barges [2] after 1933 when barge service from western grain localities to Chicago was resumed.[3] This was the barge versus rail competitive situation which existed when in 1939 the eastern railroads filed schedules with the Commission which imposed on ex-barge grain the local rate from Chicago east, but allowed ex-rail and ex-lake grain the benefit of the 8½ cent lower "reshipping" rates on the eastern haul. The result of this rate schedule would have been that, although barge lines could still have carried grain from the west to Chicago much more cheaply than the railroads could, by the time the grain had been reshipped to New York or other eastern points, the barge-rail carriage would have been more expensive to the shipper than all-rail carriage. This would have put the barge lines at a competitive disadvantage with railroads in barge-served localities. At the Commission hearing to test the validity of the higher ex-barge grain rates, a railroad representative candidly stated that the purpose of the proposal was to "drive this business off the water and back onto the rails where it belongs." 248 I. C. C. 307, 321. This purpose would most probably have been accomplished had the high ex-barge reshipping rates gone into effect.

The Commission, after a hearing, made an order which left the railroad-proposed higher rates in effect, but stated that "in a proper proceeding we might prescribe proportional rates on the ex-barge traffic lower than local rates

---

[2] See 246 I. C. C. 353, 361, 364, 383; 262 I. C. C. 7, 41.

[3] There was barge service from the grain section west of Chicago to that city from 1886 to 1907 when it was discontinued. Such barge service was resumed in 1933. See 262 I. C. C. 7, 20.

or joint barge-rail rates lower than the combinations."
248 I. C. C. 307, 311. A District Court set aside the Commission's order on the ground that fixing higher rates for ex-barge grain than for ex-rail and ex-lake grain "discriminates against water competition by the users of barges." *Cargill, Inc.* v. *United States*, 44 F. Supp. 368, 375. On appeal this Court reversed, saying that its decision carried "no implication of approval of any rates here involved." *Interstate Commerce Commission* v. *Inland Waterways Corp.*, 319 U. S. 671, 691. It reserved for future consideration in a proceeding before the Commission the amount, if any, which the eastern railroads could increase "reshipping" rates for ex-barge over those for ex-lake and ex-rail grain. *Id.* at 687–688, 691.

The Commission has now considered and decided that question in a proper proceeding. 262 I. C. C. 7. It found the originally proposed 8½ cent higher rates for ex-barge grain to be unlawful and required the eastern roads to cancel the schedules fixing those increased reshipping rates. This part of the Commission's order has not been challenged. But it also concluded that ex-barge grain rates east from Chicago would be reasonable and lawful even though they were 3 cents per hundred pounds higher than rates for ex-rail and ex-lake grain. Consequently, the Commission provided that its order cancelling the scheduled reshipping rate increase was "without prejudice to the filing of new schedules in conformity with the findings herein." Thus, the effect of the whole order was to permit, if not require, the railroads to charge higher reshipment rates for ex-barge than for ex-lake and ex-rail grain. Under these rates, barge-rail grain shipments would be a trifle less expensive than all-rail transportation between the same points.[4] But the through barge-rail transpor-

---

[4] The ex-barge proportionals fixed by the Commission were uniformly 5.5 cents lower than local rates from Chicago to the east and 3 cents higher than ex-barge and ex-lake proportionals.

tation would cost more than it would have if the through rates had accurately reflected the cheaper in-bound barge rates. The Commission considered these higher rates for ex-barge grain, which resulted in higher through rates, justified so long as there remained to ex-barge grain "a fair opportunity to move in competition with lake-rail and all-rail traffic."

Appellees[5] then filed this action in the District Court against the Commission and the United States to cancel, annul, and enjoin enforcement of the order, insofar as it permitted the railroads to put these new higher ex-barge grain rates into effect. The complaints charged that the order was in violation of the Interstate Commerce Act as amended by the Transportation Act of 1940, 54 Stat. 898.· It was contended that the order was void because it approved railroad rates which penalized ex-barge grain to the extent of 3 cents per hundred pounds, solely because the grain had been transported to Chicago in barges, and without evidence or adequate findings that it cost the railroads 3 cents more to transport ex-barge than it cost to transport ex-rail or ex-lake grain. The United States, represented by the Department of Justice, appearing as a defendant, admitted these allegations. The Interstate Commerce Commission intervened and defended the order. After a hearing, the District Court found that the allegations were sustained. Accordingly, it set aside and enjoined enforcement of the order to the extent that it permitted the 3-cent extra charge.[6] The result of the

---

[5] Appellees are (1) A. L. Mechling, a barge water carrier between Chicago and points in Illinois, Missouri, and Iowa; (2) Inland Waterways Corporation which transports grain by barges between, among other points, Kansas City and Chicago; (3) the Secretary of Agriculture, who is authorized by statute to make complaints to the Interstate Commerce Commission, and to seek judicial relief with respect to rates and charges for the transportation of farm products.

[6] Two procedural points are raised by the Commission which need not be discussed at length. The first is that the District Court's

District Court's judgment was to leave in effect the long-existing eastern railroad rates which provide the same rates for carrying ex-barge, ex-lake, and ex-rail grain east from Chicago.

Judicial review of the findings of fact and the expert judgments of the Interstate Commerce Commission where the Commission acts within its statutory authority is extremely limited. And § 307 (d) of the 1940 Act[7] authorizes the Commission "in the case of a through route" to "prescribe such reasonable differentials as it may find to be justified between all-rail rates and the joint rates in connection with such common carrier by water." *Cf. United States* v. *Chicago Heights Trucking Co.*, 310 U. S. 344, 352–353; *Board of Trade of Kansas City* v. *United States*, 314 U. S. 534, 546. But the congressional debates and committee reports on the 1940 Act and the statutory provisions which emerged from this legislative background show that Congress enunciated positive policies and specific limiting standards which it expected the Commission to follow in fixing rates, including "differentials" between all-rail and water-rail rates. The provisions of the Trans-

preliminary injunction was too broad because it enjoined the Commission from permitting the controversial rates to become effective. This question is now moot, but see *Inland Steel Co.* v. *United States*, 306 U. S. 153, 159–160. The second procedural point urged relates to the District Court's order requiring the Commission to serve notice of appeal on the United States. We see no error in this, and even if there were, it could not be prejudicial in connection with the Commission's rights on this appeal. Since the United States was necessarily a party in the District Court, 28 U. S. C. 46; *Lambert Run Coal Co.* v. *Baltimore & O. R. Co.*, 258 U. S. 377, 382, we think the District Court cannot be held in error for requiring service of the notice of the Commission's appeal.

[7] 54 Stat. 898, 937; 49 U. S. C. § 907d. In the original proceedings before the Commission, the last evidence was heard and the record was closed before the 1940 Transportation Act became a law. *Interstate Commerce Commission* v. *Inland Waterways Corp.*, 319 U. S. 671, 678. The present proceedings are fully governed by the 1940 Act.

portation Act of 1940 which brought water carriers under Interstate Commerce Commission jurisdiction were vigorously opposed in Congress by those who feared that the Commission might raise barge rates in order to enable railroads better to compete with inherently cheaper water transportation. These opponents were repeatedly assured by sponsors of the 1940 Act who advocated Commission regulation of water transportation that the questioned legislation unequivocally required the Commission to fix rates which would preserve for shippers the inherent advantages of barge transportation: lower cost of equipment, operation, and therefore service.[8]   As Senator Wheeler, spokes-

---

[8] Illustrative of the attitude of Congress is this exchange between Senator Lucas and Senator Wheeler, Chairman of the Interstate Commerce Committee:

"MR. LUCAS. . . . The town in which I live is a focal point for the transportation of wheat and corn down the Illinois.   The price of wheat and corn at the elevator there is always 2 or 3 cents higher than it is at elevators some 25 or 30 miles farther inland because of the difference between the rates by rail and those by water.

"Under the bill, as I understand it, the Interstate Commerce Commission would have the power, and it would be its duty, to fix rates on the Illinois River with respect to the transportation of that wheat and corn. Would it be possible for the Interstate Commerce Commission to fix the rate the same as the railroad rate from that point to St. Louis?

"MR. WHEELER. Not if the Commission does its duty, because the bill specifically provides that it must take into consideration the inherent advantages of the water carrier. Everyone agrees that goods can be shipped more cheaply by water than by rail." 84 Cong. Rec. 5879 (1939).

Chairman Lea of the House Committee on Interstate Commerce stated in debate that:

"The bill very plainly, about as plainly as language can be written, provides for the protection of the inherent advantages of water transportation as contrasted with other means of transportation. In fixing rates the water carrier is assured the advantages of the cheaper rate at which he can transport property." 84 Cong. Rec. 9862 (1939).

See also 84 Cong. Rec. 5883, 6125–6128, 6131, 6149 (1939), and Conference Report, 86 Cong. Rec. 10172 (1940).

man of the Interstate Commerce Committee of which he was chairman, pointed out on the floor of the Senate, the 1940 Act contains at least three separate provisions, a prime purpose of which is to protect the water carrier's natural advantages.[9]  The Act's declaration of policy emphasizes that the Act must be "so administered as to recognize and preserve the inherent advantages" of "all modes of transportation subject to . . . this Act."  54 Stat. 898, 899, 49 U. S. C. notes preceding §§ 1, 301, 901. In order that the inherent advantages might be preserved § 305 (c), 54 Stat. 898, 935, 49 U. S. C. § 905 (c), provided that "Differences in . . . rates . . . and practices of a water carrier in respect of water transportation from those in effect by a rail carrier with respect to rail transportation shall not be deemed to constitute unjust discrimination . . . or an unfair or destructive competitive practice . . . ."  And § 307 (f), 54 Stat. 898, 938, 49 U. S. C. § 907 (f), requiring the Commission, in fixing rates, to consider "the effect of rates upon the movement of traffic by the . . . carriers for which the rates are prescribed," emphasized that the Commission must consider in fixing rates ". . . the need, in the public interest, of adequate and efficient water transportation service at the lowest cost consistent with the furnishing of such service . . . ."  In addition § 3 (4) of the pre-existing Act which forbade carriers to "discriminate in their rates, fares, and charges between connecting lines," 41 Stat. 479, was amended by the 1940 Act specifically to include water carriers, such as these barge lines, within the definition of connecting carriers.  54 Stat. 898, 903–904, 49 U. S. C. § 3 (4).  Finally § 2 of the pre-existing Act has long forbidden the Commission to authorize railroads to charge one person more than another for "a like and contemporaneous service in the transportation of a like kind of traffic under substan-

---

[9] 84 Cong. Rec. 5873–5876, 5883, 6131 (1939).

tially similar circumstances and conditions . . . ." 24 Stat. 379, 380, 40 U. S. C. § 2.

The foregoing provisions flatly forbid the Commission to approve barge rates or barge-rail rates which do not preserve intact the inherent advantages of cheaper water transportation, but discriminate against water carriers and the goods they transport. Concretely, the provisions mean in this case that Chicago-to-the-east railroads cannot lawfully charge more for carrying ex-barge than for carrying ex-lake or ex-rail grains to and from the same localities, unless the eastern haul of the ex-barge grain costs the eastern railroads more to haul than does ex-rail or ex-lake grain. And § 307 (d), authorizing the Commission to fix differentials as between through water-rail and through all-rail rates, does not authorize the Commission to neutralize the effective prohibitions of the other provisions which were strengthened in 1940 expressly to prevent a discrimination against water carriers.

The basic error of the Commission here is that it seemed to act on the assumption that the congressional prohibitions of railroad rate discriminations against water carriers were not applicable to such discriminations if accomplished by through rates. But this assumption would permit the destruction or curtailment of the advantages to shippers of cheap barge transportation whenever the transported goods were carried beyond the end of the barge line. This case proves that. For while Chicago is a great grain center, it cannot consume all barge-transported grain. That grain, like other grain coming to Chicago for marketing or processing, is reshipped to distant destinations. To penalize its transportation in barges by charging discriminatory rates from Chicago to its final destination has precisely the same consequence as would follow from raising barge rates inbound to Chicago. Recognizing that it could not require these barge carriers

to raise these inbound rates which it accepted as reasonable,[10] the Commission has here approved an order which would bring about the same prohibited result by raising the railroad rates charged by eastern roads for ex-barge grain shipments east from Chicago. Congress has forbidden this.

The Commission did not approve increases in these reshipping rates on the ground that the eastern roads were not receiving a fair return for carrying ex-barge grain. And the grounds on which the Commission rested its order do not support the rates approved. Most of the argument of the Commission in support of its conclusions and order treated matters which had no relation to what the reshipping rates from Chicago should be. The length of the total barge-rail haul emphasized by the Commission, however significant it might be under other circumstances, has no relevance here. For the lower rates allowed ex-rail and ex-lake grains include carriage for distances identical with the ex-barge hauls. Nor is the Commission's order supported by its conclusion that it is "inequitable" for the barges to charge a much lower rate for the inbound grain haul than the competitive western railroads can afford to charge for the same haul, resulting in barge-rail rates lower than all-rail rates from the same localities.[11] For this is no reason for authorizing

---

[10] The Commission stated that "The barge rates yield fair returns to the barge carriers, and, for the purpose of this proceeding, may be accepted as reasonable." 262 I. C. C. 7, 19.

[11] The Commission expressed concern that "the barge-rail rates are far below the all-rail rates from the same and other Illinois origins. This is an inequitable situation giving rise to requests for reductions in the all-rail rates from the Illinois and central territory origins, and it is difficult to see, with such extreme disparities, how such requests could properly be denied. . . . there is a substantial production of corn in central territory. While the farmers therein did not appear at the hearing to show that they were hurt by this situation, such evidence was adduced by others in the same relative position . . .

a higher rate to eastern railroads which do not compete with the barges at all. If the western railroads need relief from the competition of barges, that is a question wholly unrelated to the rates of eastern roads. Furthermore, Congress has decided this question of equitable rates as between railroads and barges. It has declared in unmistakable terms that the "inherent advantage" of the lower cost of barge carriage as compared with that of railroads must be passed on to those who ship by barge. It is therefore not within the province of the Commission to adjust rates, either to equalize the transportation cost of barge shippers with that of shippers who do not have access to barge service or to protect the traffic of railroads from barge competition. For Congress left the Commission no discretionary power to approve any type of rates which would reduce the "inherent advantage" of barge transportation in whole or in part. Cf. *Mitchell* v. *United States*, 313 U. S. 80, 97.

Related to the question just discussed, is the Commission's contention here that permitting reshipping rates for ex-barge grain to remain equal to the rates for

---

This is what is meant by the statement . . . that the present ex-barge proportionals from Chicago jeopardize the all-rail rate structure." 262 I. C. C. at 20. In *United States* v. *Chicago, M. & St. P. R. Co.*, 294 U. S. 499, 509, this Court said of an earlier Commission rate decision made on the basis of preserving the over-all rate structure from disruption: "We are warned . . . that a change once permitted has a tendency to spread. The acceptance of the new schedule for Milwaukee will lead, it is said, to requests for proportionate reductions by other lines in Indiana . . . in Illinois and even in Kentucky, the outcome being characterized in the argument of counsel, though not in the report, as a rate war between the roads. . . . The point of the decision is not that present rates are sound, but that they must be maintained, even if unsound, for fear of a rate war which might spread beyond control. The danger is illusory. The whole situation is subject to the power of the Commission, which may keep the changes within bounds."

ex-rail and ex-lake grain will cause "incurable chaos" in and disrupt the national rail rate structure which reflects many interrelated conditions governing the transportation of grain from west of Chicago to eastern markets. The Commission does not show how any possible disruption of railroad rate structure arises from giving shippers the full inherent advantage of cheaper barge rates, other than that competing railroads have lost traffic to the barge lines. As we have pointed out, Congress knew that barge line rates were cheaper than rail rates, wanted the shippers to get full benefit of them, and left the Commission no power to take that benefit away from shippers by adjusting rail-barge traffic competition or rates. But we note incidentally that these rates had been equal prior to 1939 without any apparent disruption of the total structure. The possibility of such a disruption does not remotely justify discriminations against barge traffic which actually deprive shippers and the barge companies of the inherent advantages of water transportation guaranteed to them by Congress. See *United States* v. *Chicago, M. & St. P. R. Co.,* 294 U. S. 499, 506–510. Nor is the fact that barge-rail rates, from certain places in the west through Chicago to the east, are less than local rail rates from Chicago east, an adequate reason for increasing the east-of-Chicago part of the through barge-rail rate. The initiation of new rates with such a disparity in through rail rates as compared with local rail rates would, of course, be forbidden by § 4 of the Act as amended in the absence of Commission approval.[12] But, insofar as the inherent cheapness of the barge leg of the through route produces a disparity between barge-rail rates and local rail rates, Congress has said that the Act must be so administered as to preserve, not eliminate or reduce the disparity.

---

[12] See § 6, Transportation Act of 1940, 54 Stat. 898, 904, 49 U. S. C. § 4.

Carriage of ex-barge grain by eastern roads may conceivably entail more service and therefore greater costs than are involved in carrying ex-rail or ex-lake grain. If so, the eastern roads may, in certain circumstances, be justified in receiving an extra charge for that extra service wherever it is rendered. But the extra service must fit the extra charge and cannot justify lump sum rate increases which cut into the inherent advantages of cheaper barge transportation which Congress intended to guarantee to shippers. Here the Commission found in broad general terms, without limitation to the localities where barge and rail compete, that "on the average" ex-rail grain from all the west requires less terminal and transit service east of Chicago than does grain moving by barge from the relatively few barge terminals.[13] As to terminal service, it noted that some rail grain traffic going through Chicago without stopping receives no terminal service at all, whereas all barge grain shipments must be unloaded in Chicago and reloaded on freight cars. But all ex-lake grain reshipped from Chicago and an unspecified amount of ex-rail grain stopped in Chicago for processing requires exactly the same terminal service as is rendered there for ex-barge grain.[14] Yet there is no greater rate charged for ex-barge and ex-rail grain which receives this same

[13] The Commission stated that "on the average, as compared with the ex-barge grain, the movement under the ex-rail proportionals . . . requires less terminal service at the gateway . . . less transit service at intermediate points in official territory, and less line-haul service to the southern portion." 262 I. C. C. at 28.

[14] The Commission's statement was that, "Like the lake-rail traffic, the barge-rail traffic requires transfer of lading and a full origin terminal service at the interchange port. . . . it never moves in continuous through transportation." 262 I. C. C. 7, 21.

A similar precise statement does not appear in the Commission's decision with reference to terminal services rendered ex-rail grain. It assumed throughout its discussion, however, as shown by its reliance on averages, that a large but unspecified amount of all-rail grain shipments receive the same terminal services as does ex-barge grain.

terminal service. The formula used here which lumps all through rail grain rates, irrespective of the services rendered, to give rail-carried grain a preferred rate over barge-carried grain, is indistinguishable in cause and consequence from an order which directly raises barge rates to relieve the railroads from barge competition. In any event, there has been no showing by the Commission as to how much, if any, of the 3-cent reshipping rate increase is attributable to the fact that ex-barge grain requires more terminal service on the average than does ex-rail grain.

The Commission also pointed out in its decision that rail rates from the west to Chicago (which we must assume on this record are fair and reasonable for the services performed) permit three transit stops west of Chicago without extra charge. Thus some ex-rail grain, unlike ex-barge and ex-lake grain, has already been processed en route to or in Chicago before it ever reaches the eastern lines, reducing the likelihood that it will require further transit service on the route from Chicago to the east.[15] But ex-lake grain which enjoys the proportional rates with the approval of the Commission apparently is not processed before arriving at Chicago, or before reshipment on the eastern lines, and consequently requires the same transit service on the eastern haul as is required by ex-barge grain. Similar transit service is required for the unspecified amounts of ex-rail grain not processed east of Chicago. But the Commission made no finding that the eastern reshipping rates permit transit service east of Chicago without extra charge. Probably the reason that it did not make such a finding is that carriers usually make

---

[15] There is apparently no processing of barge-carried grain in Chicago. The railroads there charge 3.25–4.5 cents per hundred lbs. to switch barge grain at Chicago from riverside elevators to processing plants. 262 I. C. C. 7, 24.

a specific extra charge for transit service. See *Central R. Co. of N. J.* v. *United States,* 257 U. S. 247; *Atchison, T. & S. F. R. Co.* v. *United States, supra,* 777, 780. And the record here shows that eastern railroads make extra charges for transit service rendered ex-barge grain east of Chicago. The Commission makes no showing why, if the existing railroad charges for each individual transit operation is insufficient to cover that operation's costs, those charges cannot be adjusted alike for the ex-rail, ex-lake, and ex-barge shipments which require this service. In any event, partial compensation of eastern roads for additional transit costs cannot be made in a manner which singles out ex-barge grain for discriminatory treatment in violation of the Interstate Commerce Act.[16]

To justify increasing the reshipping rates of ex-barge grain the Commission would have to make findings supported by evidence to show how much greater is the cost to the eastern roads of reshipping ex-barge grain than of reshipping ex-lake or ex-rail grain moving from the same localities and requiring the same service as does the ex-barge grain. *Cf. Florida* v. *United States,* 282 U. S. 194, 212; *North Carolina* v. *United States,* 325 U. S. 507, 520. The unsifted averages put forward by the Commission do not measure the allegedly greater costs nor indeed show that they exist.

*Affirmed.*

MR. JUSTICE FRANKFURTER would sustain the order of the Interstate Commerce Commission, because he deems it amply supported by adequate findings of the Commission differentiating the average circumstances and condi-

---

[16] It is noteworthy that in its previous consideration of these same ex-barge grain reshipment rates, the Commission was satisfied that "the physical carriage beyond the reshipping point is substantially the same" in ex-rail, ex-lake, and ex-barge shipments. 248 I. C. C. 307, 311.

tions surrounding all-rail and lake-rail transportation from those affecting barge-rail transportation, 262 I. C. C. 27–28, and these findings are not without support in evidence.

MR. JUSTICE JACKSON, dissenting.

It appears to me that the Court in this case not only ignores findings of fact by the Interstate Commerce Commission contrary to our own oft-repeated pronouncements about the finality of administrative findings, but it also legislates out of the Transportation Act of 1940 at least two specific provisions which Congress put in and departs from the policy laid down in § 1 of the Act. Whether the Congressional law or the Court's amendments are the better for the country is a complicated problem of policy which, in my conception of our judicial function, I am not privileged to decide.

In the Transportation Act of 1940, 54 Stat. 937, *et seq.*, Congress authorized the Commission to establish through rates by water and rail carriers. It also said, "In the case of a through route, where one of the carriers is a common carrier by water, the Commission shall prescribe such reasonable differentials as it may find to be justified between all-rail rates and the joint rates in connection with such common carrier by water." § 307 (d). The Court reads this discretionary power out of the statute and holds that the Commission may not establish any differential other than that created by the carriers themselves; that is to say, the only permissible differential is the difference between barge rates and rail rates for the water leg of the through journey.

The statute also says that in the exercise of its rate-making power "the Commission shall give due consideration, among other factors, to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed . . . ." § 307 (f). The Com-

mission has done so and finds that a greater differential than that prescribed would create unjust advantages and diversions of traffic.   But the Court ignores the effect of what it orders on existing rate structures and on grain-producing regions and shippers other than barge users. It simply writes in "shall not consider" where Congress said "shall consider."

Because this decision seems to me to deprive the Commission of these discretionary powers to adjust through rates to general shipping conditions and rate structures, I dissent.

MR. JUSTICE FRANKFURTER joins in this opinion.