587 F.2d 541
 The STATE OF MAINE DEPARTMENT OF TRANSPORTATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Maine Central Railroad Company, Intervenor.
 No. 78-1045.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 6, 1978.
Decided Dec. 6, 1978.
 
 Lore H. Ford, III, Augusta, Me., for petitioner.
 Wayne M. Senville, Atty., I.C.C., Washington, D. C., with whom John H. Shenefield, Asst. Atty. Gen., Robert S. Burk, Acting Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Robert B. Nicholson and William Coston, Attys., Dept. of Justice, Washington, D. C., on brief, for respondents.
 Eugene D. Gulland, Washington, D. C., with whom Covington & Burling, Washington, D. C., and Scott W. Scully, Portland, Me., on brief, for intervenor, Maine Central Railroad Company.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 In this action to review an order of the Interstate Commerce Commission, the State of Maine asks us to set aside the ICC's order that the public convenience and necessity permits abandonment of Maine Central Railroad Company's (the Railroad) so-called Farmington Branch line between Livermore Falls and Farmington, Maine. The Farmington Branch consists of about 16 miles of track; in recent times freight trains have been operated over the track thrice-weekly, service being provided by the same crew and train that also operates over an adjacent line.
 
 
 2
 The case for abandonment, as presented in proceedings which included a hearing before an administrative law judge, was in outline as follows: The Railroad introduced evidence of a decrease in the number of freight cars using the Farmington Branch from 1973 to 1976. It represented that since 1967 it had deliberately deferred all except the most urgent maintenance on the line so as to conserve the Railroad's limited resources for more urgent needs elsewhere. As a result, the condition of the tracks and roadbed had deteriorated to the point that the maximum operating speed would soon have to be reduced from 25 to 15 miles an hour unless rehabilitation work was done. The Railroad's witness estimated the cost of rehabilitation as $300,000. If, alternatively, the tracks were not improved and operating speeds were reduced, the branch could no longer be served by the same train and crew that served an adjacent branch. In that event, the Railroad would be put to the expense of "dedicating" a full-time train wholly to the Farmington Branch. In either case, the additional costs would result in a losing operation unjustified by countervailing public benefits, since the needs of the relatively few shippers who use the line can be met by truckers; and economic trends in the region point to declining rail needs.
 
 
 3
 The administrative law judge, in a thoughtful opinion, accepted in substance the Railroad's case as described above, except he adopted, as an alternative to total abandonment, a proposal put forward at the end of the hearing by one of Maine's witnesses calling for abandonment of only one-third of the line. The judge felt that partial abandonment would reduce the costs of necessary rehabilitation by about 30% While permitting retention of all existing shippers. Division 3 of the Commission accepted most of the judge's findings,[1] but held that the Railroad was entitled to total abandonment. It was not satisfied that partial abandonment would cut rehabilitation costs by one-third or retain all existing traffic. Further it held that the future needs of the region did not warrant spending $200,000 to rehabilitate the line.
 
 
 4
 Much as we sympathize with the attempt of the administrative law judge to find a less drastic alternative than total abandonment, we must uphold the Commission. Congress has entrusted the Interstate Commerce Commission, not the courts, with primary jurisdiction over railroad abandonments, 49 U.S.C. § 1, PP (18)-(20), leaving to it the weighing of the advantages of abandonment against the disadvantages. Colorado v. United States, 271 U.S. 153, 168, 46 S.Ct. 452, 70 L.Ed. 878 (1926). A paramount consideration has traditionally been whether the expenses required for continued service on the line sought to be abandoned can be justified "in terms of the reasonably predictable revenues." Purcell v. United States, 315 U.S. 381, 385, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942). By that yardstick there is ample record support for the Commission's order here.
 
 
 5
 It is true that an argument can be made that the energy crisis warrants something like a heightened presumption against abandonments.[2] But it is for Congress and the Commission, not the courts, to fashion national transportation policy. "Judicial review of the findings of fact and the expert judgments of the Interstate Commerce Commission . . . is extremely limited." ICC v. Mechling, 330 U.S. 567, 574, 67 S.Ct. 894, 898, 91 L.Ed. 1102 (1947); See Illinois Central Railroad v. Norfolk & Western Railway, 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966) (Commission's fact finding must be upheld if there was enough underlying evidence for court to have refused a directed verdict); Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147 (1939) (Commission's findings must be upheld if they have a rational basis).
 
 
 6
 Having in mind the above review standards, we cannot accept Maine's invitation to reject the Commission's factual findings that it would cost $300,000 to rehabilitate the tracks and that, without rehabilitation, safe allowable speeds would soon drop to uneconomic levels. There was substantial evidence for these findings; indeed, in most respects the evidence was not controverted. To be sure, some of the items included in the Railroad's estimate of rehabilitation expenses, are susceptible of question. But we cannot say that they are so questionable as to be self-destructive. Even if we were not limited to a substantial evidence standard of review, an appellate court would be in no position to conduct the sort of searching factual inquiry the State of Maine would now have us conduct.
 
 
 7
 Given the evidence of falling freight car traffic and marginal profitability, and of the imminent need for sizeable expenditures to keep the Farmington Branch in operation, the Commission's decision to allow abandonment is not lacking in rationality. More especially is this so in light of findings in the elaborate Harvard study indicating that continuation of rail service is not of major significance to the region's economy.
 
 
 8
 The same rationale applies to the Commission's views concerning partial abandonment. Even assuming that partial abandonment would result in retention of most of the present traffic and a 30% Reduction in rehabilitation costs, the Commission was entitled to conclude on this record that the potential traffic did not justify even this reduced cost of rehabilitation and would not generate sufficient revenues for the Railroad to recover that cost. We agree with the Commission, moreover, that while the Railroad bore the burden of justifying abandonment, the State of Maine bore the burden of establishing the viability of suggested alternatives such as partial abandonment. The record provided little direct support for the propositions that partial abandonment would reduce expenses proportionately and would result in the retention of all present shippers. The Commission was not required to take these propositions as proven. The Commission was entitled, furthermore, to weigh the probable effect of abandonment on community needs and the Railroad's own financial health. As indicated, the detailed Harvard study of the region down-played the role of railroad service in the community's economic future. The Commission could conclude that the foreseeable impact of abandonment on the region would be slight.[3] Against this, it could conclude that abandonment would bring about offsetting benefits to the financially-pressed Railroad, including the ability to utilize the salvageable rails elsewhere on its lines. Finally, it is to be noted that §§ 1a(6) and 1a(7) of the Interstate Commerce Act, 49 U.S.C. §§ 1a(6) and 1a(7), make provision for possible rail continuation subsidies after a grant of abandonment. The Railroad argues that these rather than the ultimately self-defeating policy of requiring financially-ailing railroads to accept losses beyond their capability must be the tools for maintenance of marginal lines such as the Farmington Branch.
 
 
 9
 The Petition For Review is Denied.
 
 
 
 [1]
 Division 3's only quarrel with the judge's findings was with his determination that the Railroad had operated the Farmington Branch at an annual loss of $20,000. He reached this figure by substituting normalized maintenance costs for the skimpier actual maintenance costs. The Commission felt that only actual maintenance costs should be used which, when done, resulted in showing a small profit in 1976
 
 
 [2]
 An expert witness for the State of Maine testified to the shortsightedness of abandoning rail service and railroad rights of way just at a time when it is becoming apparent that as a result of the oil shortage, trucking is not a reasonable long-term alternative
 
 
 [3]
 The Commission did not discuss the contention, referred to in note 2, that the deepening oil crisis is bound to cause the region to become once more dependent upon the railroad to meet vital transport needs. Given the modest financial circumstances of the Railroad, and the prevailing uncertainty as to when as well as how the energy crisis will impact on railroads and on regional economies, we cannot say that the Commission was legally bound to accept this broad supposition as a basis for denying abandonment of a financially-burdensome branch line found presently to be of only slight economic importance to the region it serves. This is not, however, to underestimate the relevance of the concern