**SEATRAIN LINES, INC., Plaintiff,**

**Waterways Freight Bureau and the Port of New York Authority, Intervening Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**The Missouri Pacific Railroad Company et al., Intervening Defendants.**

**Civ. A. No. 33–62.**

United States District Court
D. New Jersey.

Sept. 1, 1964.

**200**

Stryker, Tams & Dill, by Walter F. Waldau, Newark, N. J., for plaintiff Seatrain Lines, Inc.; Chadbourne, Parke, Whiteside & Wolff and S. S. Eisen, New York City, of counsel.

Walter F. Waldau, Newark, N. J., and Nuel D. Belnap, Chicago, Ill., for intervening plaintiff Waterways Freight Bureau; Stryker, Tams & Dill, Newark, N. J., and Belnap, Spencer, Hardy & Freeman, Chicago, Ill., of counsel.

Francis A. Mulhern, Newark, N. J., for intervening plaintiff Port of New York Authority; Arthur L. Winn, Jr., and La Roe, Winn & Moerman, Washington, D. C., of counsel.

David M. Satz, Jr., U. S. Atty., Newark, N. J., by Edward J. Turnbach, Asst. U. S. Atty., for defendant United States.

Robert W. Ginnane, Gen. Counsel, by Robert S. Burk, Atty., I. C. C., Washington, D. C., for defendant Interstate Commerce Commission.

Lum, Biunno & Tompkins, by Charles H. Hoens, Jr., Newark, N. J., for intervening defendants Missouri Pac. R. Co., and others; Robert S. Davis, St. Louis, Mo., of counsel.

Before SMITH, Circuit Judge, and MEANEY and AUGELLI, District Judges.

AUGELLI, District Judge.

Plaintiff Seatrain Lines, Inc. (Seatrain), a common carrier by water, challenges the validity of an order and report made by the Interstate Commerce Commission (Commission) on August 6, 1963, in proceedings entitled "Aluminum Articles from Sandow, Tex., to Pennsylvania and New York", 319 I.C.C. 431.

We are here concerned only with those parts of the challenged order and report that pertain to the movement of aluminum articles from Sandow, Texas, to Cressona, Pennsylvania, by all-rail and

rail-water-rail routes. It is with respect to this movement that Seatrain objects to the Commission's finding that the all-rail rates in issue do not discriminate against Seatrain in violation of section 3(4) of the Interstate Commerce Act (Act), 49 U.S.C.A. § 3(4).

The all-rail route originates at Sandow, Texas, with the Rockdale, Sandow & Southern Railroad Company, which in turn connects with the Missouri Pacific Railroad Company at Marjorie, Texas. From that point the Missouri Pacific continues the run to Longview, Texas, where connection is made with the Texas & Pacific Railway Company, which moves the shipment to Texarkana, Arkansas. At Texarkana connection is again made with the Missouri Pacific, which then proceeds north and eastward to three alternate gateways: St. Louis, Missouri; East St. Louis, Illinois; and Flinton, Illinois. At these gateways connections are made with other rail carriers for further eastward movement to Cressona, Pennsylvania.

The rail-water-rail route also originates at Sandow, Texas, with the Rockdale, Sandow & Southern Railroad Company. In this movement, too, connection is made with the Missouri Pacific at Marjorie, Texas. From Marjorie, the shipment moves via the Missouri Pacific to Texas City, Texas. At this point the cars thus transported by rail, with lading intact, are loaded aboard a Seatrain vessel for movement by water to Seatrain's northern port at Edgewater, New Jersey. At Edgewater the cars, again with lading intact, are transferred to a rail carrier for ultimate destination to Cressona, Pennsylvania.

The presently effective all-rail through rate for the aluminum traffic here involved is $1.19 per hundred pounds, minimum 100,000 pounds. This is a joint rate maintained by all the railroads participating in the movement. The rail-water-rail rate presently effective is $1.15 per hundred pounds, same minimum. This is a non-concurring through rate composed of the local rail rate of .44 cents from Sandow to Seatrain's port at Texas City, Seatrain's ocean rate of 43 cents from Texas City to Edgewater, and the local rail rate of 28 cents from Edgewater to Cressona.

The aluminum traffic giving rise to the present controversy originated in 1952 when the Aluminum Company of America built an ore reduction plant at Sandow, Texas, to produce aluminum billets for its fabricating plants located at Cressona, Pennsylvania, and Rome, New York. From 1952 until January, 1959, the aluminum traffic moved exclusively over the all-rail route from Sandow to Cressona and Rome. In January, 1959, Seatrain commenced to participate in the business. Thereafter, the traffic pattern shifted to Seatrain, the last movements by all-rail having occurred during the period of a longshoremen's strike in October, 1959. A statement of the rate manipulations that brought about this change will prove helpful to an understanding of the case.

Prior to November 10, 1958, the all-rail rate for the aluminum movement from Sandow to Cressona was a fraction more than $1.43 per hundred pounds. Seatrain's rail-water-rail rate was a fraction more than $1.69. This represented a combination of the local rail rate of 72 cents from Sandow to Texas City, the ocean rate of a little over 50 cents from Texas City to Edgewater, and the local rail rate of 47 cents from Edgewater to Cressona. Effective November 10, 1958, the local rail rate from Sandow to Texas City was reduced from 72 cents to 44 cents. This gave Seatrain a differential in its favor of 2.1 cents over the all-rail rate. On January 10, 1959, the local rail rate from Edgewater to Cressona was reduced from 47 cents to 39 cents. The differential in favor of Seatrain now amounted to 10.1 cents. A reduction made by Seatrain on its ocean rate in this same month of January from 50¼ cents to 47½ cents, increased this differential to 12.85 cents. On May 8, 1959, Seatrain reduced its ocean rate to 40 cents, thereby increasing its differential to 20.35 cents. The rail-water-rail rate was now $1.23 as com-

pared with the all-rail rate of $1.43, which had remained constant during this period.

On June 21, 1959, the all-rail rate was reduced to $1.30 thus cutting down Seatrain's differential to 7 cents. Following this, on July 24, 1959, Seatrain reduced its ocean rate to 36 cents which resulted in a rail-water-rail rate of $1.19 as against the all-rail rate of $1.30. This produced a differential of 11 cents in favor of Seatrain. On February 20, 1960, the all-rail rate was reduced to $1.19 to match Seatrain's rate. On February 29, 1960, Seatrain again reduced its ocean rate from 36 cents to 32 cents. This made the rail-water-rail rate $1.15, a differential of 4 cents in favor of Seatrain over all-rail. In May, 1960, a reduction in the local rail rate from Edgewater to Cressona from 39 cents to 28 cents, enabled Seatrain to increase its ocean rate to 43 cents and still maintain a rate 4 cents lower than all-rail. This same differential has continued to the present time.

The proceedings with which we are here concerned, and which resulted in the order and report under attack, stemmed from cross protests filed with the Commission by certain railroads and by Seatrain in connection with the reduction of the all-rail rate from $1.30 to $1.19 and the rail-water-rail rate from $1.19 to $1.15. The Commission, in Docket No. 33362, ordered an investigation into the lawfulness of Seatrain's rail-water-rail rate, and in Docket No. 33373 ordered an investigation into the lawfulness of the all-rail rate. These two dockets were consolidated and the matter was heard on one record before an examiner for the Commission.

Seatrain contended before the examiner that the railroads, by reducing the all-rail through rate from $1.30 to $1.19, without making a corresponding reduction in the local rail rates from Sandow to Texas City and from Edgewater to Cressona, were practicing selective rate cutting solely for the purpose of eliminating Seatrain's participation in the aluminum traffic. Seatrain argued that, to

the extent the all-rail rate under investigation in Docket 33373 was on a lower level than the local rail rates maintained to and from the ports used in connection with Seatrain's water route, it was discriminatory against Seatrain and in violation of section 3(4) of the Act. The railroads, on the other hand, argued for equality of rates, stating that they had a proposed rate pending of $1.15, which they did not seek to justify. The railroads suggested that the Commission fix a rate of $1.15 for both carriers for a trial period of one year in order to ascertain whether or not the traffic could be shared on that basis. In answer to this proposal Seatrain pointed out that it was the low-cost carrier; that because of inherent disabilities in its operations, it could not hope to compete with the railroads at equal rates; and that, in order to compete, it needed a rate differential in its favor.

The examiner decided in favor of Seatrain and found that the failure of the railroads to provide proportional rates to and from Seatrain's ports on a comparable basis with the reduced all-rail rate from Sandow to Cressona was discriminatory and contrary to the national transportation policy. In a report and order dated November 16, 1960, in which he recommended that the Commission direct the railroads to maintain proportional rates to and from the Seatrain ports, the examiner prescribed the formula to be used to eliminate the unlawfulness he found to exist in the rail rate under investigation. The formula was based on the Docket 28300 first-class rates prescribed by the Commission in "Class Rate Investigation, 1939", 281 I.C.C. 213. Section 6(11) (b) of the Act, 49 U.S.C.A. § 6(11) (b), which authorizes the Commission to establish the proportional rates suggested by the examiner, provides that "[b]y proportional rates are meant those which differ from the corresponding local rates to and from the port and which apply only to traffic which has been brought to the port or is carried from the port by a common carrier by water."

The railroads filed exceptions to the examiner's report. The record was then considered by Division 2 of the Commission. The Division, after stating that the burden of establishing the unlawfulness of the all-rail rate was on Seatrain, held that Seatrain failed to show such rate to be unlawful; also, that the local rail rates to and from the Seatrain ports were not in issue in the Docket 33373 investigation; and that, on the basis of the evidence before the Division, there was no indication that the all-rail rate in issue discriminated unlawfully against Seatrain. The Division concluded that the reduced rail-water-rail rate of $1.15 in Docket 33362 was just and reasonable, and otherwise lawful, and that the reduced all-rail rate of $1.19 in Docket 33373 was not shown to be unlawful. The report and order of the Division discontinuing the proceedings will be found in 313 I.C.C. 687. By order dated November 13, 1961, the Commission denied Seatrain's petition for reconsideration of the Division 2 decision. On January 16, 1962, Seatrain filed its original complaint in this Court against the Commission and the United States of America seeking to set aside the Division 2 report and order, and the Commission's denial of Seatrain's petition for reconsideration.

During the pendency of the aluminum proceedings, investigations and hearings in other cases having comparable issues, but involving different commodities (DDT in Docket No. 7513, and soda ash in Dockets No. 33698 and 7552), resulted in decisional conflicts on the application and interpretation of section 3(4) of the Act. In light of these developments the Commission, on its own motion, by order dated January 26, 1962, reopened the aluminum proceedings, combined them with the DDT and soda ash cases, and set all matters down for oral argument before the entire Commission on the section 3(4) discrimination issue. The matter was heard on March 7, 1962. Pending determination thereof, the action in this Court was held in abeyance. On August 6, 1963, by re-port and order dated that day, the Commission decided, so far as is here pertinent, that the reduced all-rail rate in issue in Docket 33373 did not discriminate against Seatrain in violation of section 3(4) of the Act, and by a vote of 6 to 3 affirmed the Division 2 decision, with two members of the Commission not participating.

On September 11, 1963, Seatrain filed its amended complaint herein. Leave to intervene as plaintiffs in this action has been granted to The Port of New York Authority and to Waterways Freight Bureau, an association of common carriers by barge. The Missouri Pacific Railroad Company and other railroads which had appeared in the aluminum proceedings before the Commission were allowed to intervene as defendants. The arguments of all intervenors in support of the position of either Seatrain or the Commission, as the case may be, have been considered by the Court, and no separate reference to such arguments will be made in this opinion.

■■ The limited scope of judicial review of orders of the Commission is well established. A court cannot substitute its judgment for that of the Commission, but can only ascertain whether there is warrant in the law and facts for the order under review. If, upon a review of the whole record, there is a rational basis for the action of the Commission and no abuse of discretion or prejudicial departure from the requirements of law, the determination of the Commission will not be disturbed. Shein v. United States, 102 F.Supp. 320 (D. N.J.1951); Northern Valley Transfer, Inc. v. Interstate Commerce Commission, 192 F.Supp. 600 (D.N.J.1961); Chicago, Rock Island & Pacific Railroad Co. v. United States, 205 F.Supp. 378 (N.D.Ill. 1962).

With a full appreciation of the limitations thus placed upon us, we nevertheless conclude that the Commission erred in its interpretation and application of section 3(4) of the Act to the facts of

this case. That section, in pertinent part, reads as follows:

"All carriers subject to the provisions of this chapter * * * shall not discriminate in their rates, fares, and charges between connecting lines, * * *. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this chapter or any common carrier by water subject to chapter 12 of this title."

It is clear that section 3(4) prohibits discrimination between connecting carriers. The Commission found that Seatrain is a connecting carrier within the meaning of section 3(4), but concluded that Seatrain had failed to prove a violation of that section. This conclusion was based upon findings that "the two different routes, all-rail and rail-water-rail, comprehend completely different services", and that the "relevant transportation circumstances and conditions at the two points of interchange are so radically different that a finding of discrimination against Seatrain would be arbitrary and capricious". In addition to the foregoing, the Commission also found that there had not been sufficient identification of the discriminating railroad or railroads.

On brief, the Commission submits that even if, as contended by Seatrain, these findings are insufficient and unsupported, such legal infirmity will not avail Seatrain because of Seatrain's failure to carry its burden of proving comparability of transportation conditions and identity of the offending rail carrier or carriers. Seatrain claims it did not fail in its burden of proof; that it made out a prima facie case of discrimination; and that the burden thereupon passed to the railroads to show such dissimilarity in transportation service as would justify the difference in rates.

We now turn to a study of the record on the issue of discrimination under section 3(4) of the Act.

As to the identity of the railroads guilty of discrimination, the record does not, in our view, support the Commission's conclusion that Seatrain did not sufficiently identify the discriminating railroads. The evidence points directly to the Missouri Pacific and the Rockdale, Sandow & Southern. Both participate in the movements of the aluminum traffic from Sandow to the points of interchange with the eastern railroads at either St. Louis, East St. Louis or Flinton, and from Sandow to Seatrain's point of interchange at Texas City. It is true that two additional carriers are separately involved in the movements over both routes. On the Sandow-Texas City route, the services of the Texas City Terminal Railway Company are utilized to switch the railroad cars to the lifting facilities of Seatrain for placement aboard ship. On the run from Sandow to an eastern gateway, the Texas & Pacific Railway Company participates in one segment of that route. While a reading of the Commission report does not reveal what consideration, if any, was given to the fact that these two additional carriers were also involved in the aluminum traffic in the manner indicated, the argument seems to be that their participation therein somehow precluded a finding of discrimination against the Missouri Pacific and the Rockdale, Sandow & Southern.

So far as the Texas City Terminal Railway Company is concerned, it can hardly be considered an independent carrier on the Sandow-Texas City run. There is testimony, not disputed, that the Company is owned by the Missouri Pacific and other railroads, and that its function is to act as the switching agent for such railroads, for which services it receives a switching charge. There is no indication whatsoever that it has any voice or responsibility for the level of the line-haul rate to Texas City. It is clear that in this case, the Company acted solely as the agent of the Missouri Pacific in switching the cars to Seatrain. See Missouri Pacific Railroad Co. v. Reynolds-Davis Grocery Co., 268 U.S. 366, 45 S.Ct. 516, 69 L.Ed. 1000 (1925).

■ Turning now to the Texas & Pacific Railway Company and its participation in the all-rail route, we are of the opinion that for the purposes of this case it must be treated as part of the Missouri Pacific system. References are made in the briefs to the proceedings in Financial Docket 22274, in which an examiner for the Commission, in a recommended report dated November 6, 1963, found that the Missouri Pacific owns 82 per cent of the capital stock of the Texas & Pacific, and that the two railroads have the same executive and operating officers. This is not disputed by the railroads, except they point out that the same report also showed that the Texas & Pacific operated as a separate and independent carrier which interchanged with the Missouri Pacific. Be this as it may, the conclusion is inescapable that the Texas & Pacific is practically a wholly owned subsidiary of the Missouri Pacific and subject to its control. See Chicago, M. & St. P. Ry. v. Minneapolis Civic Assn., 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229 (1918). It also appears that there is presently pending before the Commission an application to physically merge the properties of the two railroads.

■ The record shows, as noted by the Commission, that the Missouri Pacific is the long-haul carrier over both routes to the interchanges. From Sandow to Texas City the haul is approximately 181 miles, and from the same point of origin to the Flinton gateway, approximately 860 miles. The assumption made by the Commission, *arguendo,* that the Missouri Pacific, as the long-haul carrier on both routes, was the railroad guilty of discrimination, should have been more than an assumption. On the basis of the evidence of record, we find it difficult to accept as supportable findings the statements appearing in the Commission report that Seatrain has "not shown * * * which carriers are the effective cause of such possible discrimination" or that "it [is not] clear which particular rail carrier or carriers are discriminating." In our opinion, Seatrain has sufficiently identified the discriminating railroads as the Missouri Pacific and the Rockdale, Sandow & Southern.

Next to be considered is whether there is support in the record for the Commission's conclusion that differences in the transportation circumstances and conditions over the all-rail and rail-water-rail routes, and at the interchanges, precluded a finding of discrimination against Seatrain.

With respect to the statement appearing in its report that the two competitive routes, all-rail and rail-water-rail, "comprehend completely different services", the Commission, in its brief, points to the fact that shipments take longer over the rail-water-rail route; that there are restrictions on the type of equipment that can be used in that movement; that there is loss to the rail carrier of the use of its cars for a longer time than if the shipment moved all-rail; and that there is a loss of freedom to substitute different types of equipment when shortages occur.

As to the "radically different" conditions existing at the interchanges, it is pointed out that Seatrain has no yard of its own at Texas City where it may receive cars in interchange from the rail carrier and hold them until ready for loading on a Seatrain ship; that cars can be interchanged only one at a time during the loading operation; that Seatrain has only two sailings a week from Texas City, thus resulting in loaded railroad cars being held upon arrival in the yard of the Texas City Terminal Railway Company until a Seatrain ship is ready to load them on board; that this "bunching" of cars is a regularly recurring problem and a disability of Seatrain service; and that the Seatrain witness who testified concerning these matters was unable to state whether Seatrain or the rail carriers paid the per diem charge for holding the cars that are awaiting shipment.

It is also argued by the Commission that there cannot be any substantial similarity of transportation circumstances and conditions because while both routes

originate at Sandow, they are comprised of different railroads, travelling different distances, in opposite directions, and to different points of interchange.

It is on the basis of such testimony and argument, we are told, that "the Commission correctly found that on this record the all-rail and rail-water-rail routes comprehend different services and the relevant transportation circumstances and conditions at the two points of interchange are so radically different that a finding of discrimination against Seatrain would be arbitrary and capricious." And we are reminded, as previously mentioned, that if perchance we accept Seatrain's argument that these findings find no support in the record, we must nevertheless deny Seatrain relief because it has failed to carry its burden of proof in the Commission proceedings.

It must be admitted that there are differences in the transportation circumstances and conditions involved in this case. We have already discussed the question of the identity of the railroads comprising the routes to Texas City and to the eastern gateways. The mere fact, without more, that the two routes go in different directions from a common point of origin to reach different points of interchange, and travel different distances to reach those points, is not conclusive.

■ The issue involved in this case is whether the 44 cent Sandow-Texas City rate maintained by the western railroads, is discriminatory against Seatrain and in violation of section 3(4) when compared, in light of such differences in transportation conditions as may exist in this case, with the all-rail through rate, and the division thereof that accrues to those same railroads for their services to a connecting rail carrier at one of the eastern gateways. As noted by the Commission in its report, a mere difference in rate levels, in and of itself, proves nothing. The essence of discrimination lies in demanding a disproportionate charge for the performance of comparable service. Where a difference in rates is not justified by a difference in the services rendered, there is discrimination. See Western

Union Telegraph Company v. Call Publishing Company, 181 U.S. 92, 21 S.Ct. 561, 45 L.Ed. 765 (1901); Interstate Commerce Commission v. Mechling, 330 U.S. 567, 581, 583, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); Tennessee Valley Authority v. United States, 96 F.Supp. 409, 415 (N. D.Ala.1951).

In Mechling, for example, the contention was made that the Commission had approved higher railroad rates for the transportation of ex-barge grain out of Chicago than for ex-rail or ex-lake grain, without evidence or adequate findings that it cost the railroads more to transport ex-barge than it did to transport ex-rail or ex-lake grain. In setting aside the Commission order as discriminatory, the Court stated, 330 U.S. at page 581, 67 S.Ct. at page 901:

"Carriage of ex-barge grain by eastern roads may conceivably entail more service and therefore greater costs than are involved in carrying ex-rail or ex-lake grain. If so, the eastern roads may, in certain circumstances, be justified in receiving an extra charge for that extra service wherever it is rendered. But the extra service must fit the extra charge and cannot justify lump sum rate increases which cut into the inherent advantages of cheaper barge transportation which Congress intended to guarantee to shippers."

It may also be observed at this point, that while there is some testimony, to which we have already adverted, concerning "transportation circumstances and conditions" as the Texas City interchange, the record is meager, if not barren, of any similar testimony regarding any of the interchange points at the eastern gateways.

The basis for Seatrain's claim that it made out a prima facie case of discrimination will not be considered.

The all-rail route from Sandow, Texas, to Cressona, Pennsylvania, covers a distance of 1636 miles. The rail-water-rail route between the same points is 2524 miles. Included in this latter figure is

the rail distance of 181.6 miles from Sandow to Texas City, and the rail distance of 161.7 miles from Edgewater to Cressona. As previously stated, the Missouri Pacific interchanges with Seatrain at Texas City on the rail-water-rail route, and with the eastern rail carriers at either St. Louis, East St. Louis or Flinton on the all-rail route. For the purposes of this discussion, we shall select Flinton, which is some 867 miles from Sandow, as the point of interchange on the all-rail route. References hereinafter made to rates and costs will be stated in cents per 100 pounds.

Cost studies introduced in evidence by Seatrain established that the fully distributed costs for the all-rail route amounted to 103.4 cents, as against 71.7 cents for the rail-water-rail route. The fully distributed costs of the segments which go to make up the 71.7 cents were shown to be 12.9 cents for the 181.6 miles from Sandow to Texas City; 42 cents for the water distance of 2181 miles from Texas City to Edgewater; 16.5 cents for the 161.7 miles from Edgewater to Cressona; and 0.3 cents for loss and damage. On the basis of this evidence the Commission found, and this finding is not challenged, that the rail-water-rail route is the low-cost route, and that Seatrain is the low-cost mode of transportation.

It is against this background of costs that Seatrain seeks to show discrimination by the offending railroads in favor of a connecting rail carrier at Flinton, for example, and against Seatrain, the water carrier, at Texas City. Seatrain stresses the fact that the all-rail rate of $1.19 is a joint rate, voluntarily participated in by all the railroads involved in the aluminum traffic, whereas the rail-water-rail rate, because of the refusal of the railroads to participate with Seatrain in a joint rate, is a combination of the rail rates to and from Seatrain's ports, and the port to port water rate. As previously stated, it is Seatrain's position that the reduction in the all-rail rate to $1.19, without a corresponding reduction in the rail factors to and from the ports, discriminates against Seatrain

in violation of section 3(4). The principal attack is directed to the 44 cent rail factor from Sandow to Texas City, which Seatrain claims is the most important and most discriminatory rate factor in the rail-water-rail route.

The evidence shows that the cost to the offending western railroads for performing the run of 181.6 miles from Texas City to Sandow is 12.9 cents. They demand and receive from Seatrain for this service 44 cents, leaving them with a profit of 31 cents, or revenue amounting to 341.1 per cent of fully distributed costs. In contrast, when these same railroads participate in the all-rail movement from Sandow to Cressona at the all-rail rate of $1.19, they are content to receive 59 cents for making the run of 867 miles from Sandow to Flinton, Illinois. The rail cost involved in this operation is 43 cents, leaving a profit of 16 cents, which amounts to only 137.2 per cent of fully distributed costs for performing that service. Thus, on the all-rail route, the western railroads earn approximately 50 per cent less profit for nearly 400 per cent more mileage.

On a revenue per car-mile basis, the all-rail rate of $1.19 over the Sandow-Cressona distance of 1636 miles, produces earnings of 73 cents. In contrast, the 44 cent rail rate paid to the western railroads by Seatrain for the Sandow-Texas City run of 181.6 miles, produces car-mile earnings of $2.42. Seatrain also established the relationship of the rates in question to the Docket 28300 first-class rates. It was shown that the $1.19 all-rail rate from Sandow to Cressona is 18 per cent of the Docket 28300 first-class rate of $6.61, whereas the 44 cent rate from Sandow to Texas City is 24.4 per cent of the corresponding 28300 first-class rate of $1.80.

Nowhere in the report of the Commission do we find any criticism of Seatrain's evidence relating to cost comparisons, comparison of rates based on Docket 28300 first-class rates, and divisions of revenue over costs, or the probative value thereof. Such evidence has been considered by the Commission in

many rate discrimination cases. Dixie Carriers v. United States, 351 U.S. 56, 76 S.Ct. 578, 100 L.Ed. 934 (1956); Alabama Great Southern Railroad Co. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951); New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); Atchison, Topeka & Santa Fe Railway Co. v. United States, 218 F.Supp. 359 (N.D.Ill.1963); Arrow Transportation Co. v. United States, 176 F.Supp. 411 (N.D.Ala.1959), aff'd 361 U.S. 353, 80 S.Ct. 406, 4 L.Ed.2d 362; Georgia Public Service Commission v. Bush Terminal Railroad Company, 310 I.C.C. 225 (1960). Indeed, the Commission, on brief, admits that perhaps such evidence as was used by Seatrain in this case would, on an adequate record of similar transportation conditions, sustain a "no common junction point" violation of section 3(4) of the Act.

In further support of its case, Seatrain argues that the maintenance by the railroads of the local rates to and from the Seatrain ports has compelled it to reduce its rate to 43 cents for the water carriage portion of the rail-water-rail movement, a level of only 1 cent above its costs; that Seatrain's revenues from its participation in the Sandow to Cressona aluminum traffic amount to only 102.4 per cent of its costs; and that from a mileage standpoint, while Seatrain provides 85 percent of the rail-water-rail service, it receives only 37 per cent of the rail-water-rail rate.

Seatrain claims it cannot, at equal rates, hope to compete with the railroads in the transportation of aluminum articles from Sandow to Cressona. Seatrain's General Freight Traffic Manager testified that "our experience has consistently been, throughout our existence, that at equal rates, all-rail and rail-Seatrain-rail, Seatrain cannot hope to participate in a pound of tonnage." In Georgia Public Service Commission v. Bush Terminal Railroad Company, 310 I.C.C. 225, a case also involving Seatrain and having issues comparable to those here being considered, the Commission observed, on the basis of the testimony

adduced before it, that "Seatrain has never been able to obtain any traffic except when the total transportation cost to shippers was lower than that over all-rail routes", and also, that the considered traffic in that case "[would] not move by rail-water-rail except at rates differentially lower than the all-rail rates."

In the aluminum traffic here involved, Seatrain is presently operating at a rate that is 4 cents under the all-rail rate. It contends it must have this differential if it is to participate in the aluminum movement. Such differential, says Seatrain, is necessary to offset the disabilities inherent in water transportation that are not encountered in all-rail service, such as, perils of the sea, infrequency of sailings, longer time in transit, lack of diversion and stop-off privileges in transit, bunching of cars at the interchanges, restrictions on size of cars handled, labor difficulties and strikes affecting coastwise shipping, and an embargo requiring shippers to obtain a permit before cars are supplied for movement in Seatrain service. In light of these disabilities it seems obvious, as stated by Seatrain, that the only attraction it has to offer shippers is a lower rate, made possible by lower costs of operation.

At the hearing before the examiner on July 20, 1960, there was testimony that 10 of the commodities handled by Seatrain, including aluminum, account for 88 per cent of Seatrain's northbound traffic from Texas City; that the loss of any one commodity would seriously affect Seatrain's ability to continue operations; that the aluminum tonnage alone for the year 1959, constituted 11.3 per cent by weight, and 7.3 per cent by revenue, of Seatrain's total northbound tonnage and revenues; and that for the first 5 months of 1960, the aluminum traffic reflected 10.8 per cent and 7.2 per cent, respectively, of the northbound tonnage and revenues. Specifically, on the aluminum traffic, there was testimony that the loss thereof "would reflect a loss in net revenue for Seatrain of a couple hundred thousand dollars a year."

Operating figures in evidence disclose that the last year Seatrain operated in the black was 1957, and that losses from shipping operations sustained by Seatrain in 1958 amounted to $246,729, in 1959 to $733,813, and for the first quarter of 1960, $107,340. It is stated in Seatrain's brief that these losses have continued to date unabated. Seatrain argues that the principal cause of these losses has been the necessity for Seatrain constantly to reduce its rate levels to meet the all-rail reductions which, it claims, are aimed at Seatrain's rates and services, and that, as a result of such rate reductions by the railroads, Seatrain's revenue per ton has consistently decreased over the past years.

Seatrain also points out that since most shippers utilizing its services are not located at the port, the freight to be carried by Seatrain must move by rail from point of origin and, following a trip by water, again by rail to point of destination. Thus, argues Seatrain, its ability to participate in the aluminum traffic depends upon the local rail factors to and from the ports, as well as on the all-rail rate from origin to destination.

Seatrain claims it is being subjected to a "rate squeeze" by the railroads, and that they are deliberately attempting to destroy water carrier service. It is contended that the action of the railroads here in reducing the all-rail through rate, while continuing to maintain the local rates to and from the ports at an abnormally higher level than the through rate, enables the railroads not only to eliminate water carrier participation in the aluminum traffic, but also to ultimately destroy water carriage. In this connection Seatrain stresses that the operation of its vessels is important to the national defense.

Mention might also be made at this point of the railroads' pending proposed rate reduction to $1.15. If this rate becomes effective, says Seatrain, it will reduce its rate to $1.11 in order to maintain the presently existing differential of 4 cents, which it claims it must have in order to participate in the aluminum traffic, such participation being necessary "in order to live."

We appreciate that some of the facts thus far stated in this opinion may not be germane to the issue of discrimination, but we feel that such recital will prove helpful in understanding the nature of the discrimination we are dealing with here. The basic question is whether, under the facts of this case, the charges demanded by the western railroads for services performed over their route to and with one connection Seatrain, at Texas City, are disproportionate when compared with the charges made by these same railroads over their route to and with another connection, a rail carrier, at one of the eastern gateways. Stated simply, are the transportation conditions over the two routes and at the points of connection or interchange so dissimilar as to justify the difference in rates shown by this record.

We find nothing in the majority report of the Commission, beyond a recital of some of Seatrain's computations, to indicate what consideration was given by the Commission to the claimed discrimination resulting from the continued maintenance by the western railroads of an origin port rate (Sandow to Texas City) on Seatrain's route, on a relatively higher level, when tested by costs and Docket 28300 first-class rates, than the level of the all-rail rate in which the western railroads participate, and the level of the division which those same railroads accept out of the all-rail rate.

We again point out that for the rail service from Sandow to Texas City, a distance of 181.6 miles, the western railroads receive from Seatrain a rate of 44 cents. The cost to the railroads for performing this service is 12.9 cents. This results in a profit of 31 cents, which is equivalent to 341.1 per cent of full costs. For the rail service from Sandow to the eastern gateway at Flinton, a distance of 867 miles, the western railroads receive a division of 59 cents. The costs to the railroads for performing this service is 43 cents. This results in a profit of 16 cents, which is equivalent

to 137.2 per cent of full costs. Apparently, these disparities of rates over costs, and divisions of revenue, if considered by the Commission, were not deemed to be of any significance in view of its ultimate finding of no discrimination based on dissimilarity of transportation conditions. But, as noted earlier in this opinion, a difference in charge must bear a reasonable relationship to the difference in service. We are not persuaded from our examination of the record, that the differences in transportation conditions which we have noted, when considered in light of costs, division of revenue, and Docket 28300 first-class rates, justifies the difference in rate treatment.

We think a proper appraisal of the situation was made by Commissioner Walrath in his dissent to the majority report in this case. He said:

"As conceded by the majority, *Seatrain*, with respect to most, if not all, of the traffic involved in these cases is a connecting carrier within the meaning of section 3(4). Yet relief is refused on the ground that there is no discrimination, or that, if there is, it has not been pinpointed with sufficient accuracy to direct correction thereof. Certain of the statistical summaries set forth in the report are worthy of repetition here. Thus, in the Aluminum Articles cases, the all-rail rate of $1.19 is 115 percent of fully distributed costs over that route, whereas, over the rail-water-rail route, the origin *rail* rate is *341 percent* of fully distributed costs, the destination *rail* rate is *170 percent* of fully distributed costs, and the *water* rate is only *102.4 percent* of fully distributed costs. Over the rail-water-rail route, the 343.3 rail miles, equivalent to only *21 percent* of the rail overland mileage, are responsible for revenue corresponding to *63 percent* of the rail-water-rail charge and *61 percent* of the all-rail charge! Certainly differences of such proportions rate an appellation more accurately descriptive

than 'mere', and constitute a prima facie case for Commission action under section 6(11) (b)." (Underlined matter appears italicized in the quote.)

The Commissioner continues:

"In the face of such patent and overwhelming differences, disposition denying relief on the general and nebulous ground of dissimilar circumstances would seem to be of doubtful legal sufficiency. Of course the circumstances are dissimilar; the question is whether from a transportation standpoint they are so dissimilar as to warrant the vast differences. Neither the record nor the report is convincing that they are."

■ We are satisfied, upon a review of the record as a whole, that Seatrain established a prima facie case of discrimination, and that thereupon the burden passed to the western railroads to show by some evidence, cost or otherwise, that the difference in transportation conditions justified the rate disparities shown to exist in this case. See Chesapeake & Ohio Railway Co. v. United States, 11 F.Supp. 588 (S.D.W.Va.1935), aff'd 296 U.S. 187, 56 S.Ct. 164, 80 L.Ed. 147; Atchison, Topeka and Santa Fe Railway Co. v. United States, 218 F. Supp. 359 (N.D.Ill.1963).

■■ It was not until the Act was amended by the Transportation Act of 1940, 49 U.S.C.A. § 1 et seq., that water carriers were made subject to regulation by the Commission. As one of the results of the amendment, that section of the Act which prohibited discrimination in rates, fares, and charges between connecting lines, became the present section 3(4), with a new provision added thereto stating that the term "connecting line" as used in said section, means the connecting line of any carrier, including any common carrier by water. The legislative history of the 1940 amendment is fully explored and considered in a number of cases, among them being Interstate Commerce Com-

mission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); Dixie Carriers v. United States, 351 U.S. 56, 76 S.Ct. 578, 100 L.Ed. 934 (1956); Arrow Transportation Co. v. United States, 176 F.Supp. 411 (N.D.Ala.1959), aff'd 361 U.S. 353, 80 S.Ct. 406, 4 L.Ed. 2d 362. It is clear that the Transportation Act of 1940, when read in light of the National Transportation Policy, 49 U.S.C.A. preceding § 1, was intended, inter alia, to prevent discrimination against water carriers. We shall now consider the cited cases.

The Mechling case involved section 307(d) of the Act, 49 U.S.C.A. § 907(d), which authorizes the Commission to fix differentials as between through water-rail and through all-rail rates. The Commission, by order, had approved higher rail rates for the transportation of wheat east of Chicago if it had arrived in Chicago by barge rather than by rail or lake. It was contended that this action was void in that it approved railroad rates which penalized ex-barge grain to the extent of 3 cents per hundred pounds, solely because the grain had been brought to Chicago by barge, and without evidence or adequate findings that it cost the railroads 3 cents more to transport ex-barge than it did to transport ex-rail or ex-lake grain. The order was set aside on the ground that it discriminated against water carriers and the goods they transport.

Mr. Justice Black, who delivered the opinion of the Court, in commenting upon the legislative history of the 1940 amendment, had this to say, 330 U.S. at pages 574, 575, 67 S.Ct. at page 898:

"The provisions of the Transportation Act of 1940 which brought water carriers under Interstate Commerce Commission jurisdiction were vigorously opposed in Congress by those who feared that the Commission might raise barge rates in order to enable railroads better to compete with inherently cheaper water transportation. These opponents were repeatedly assured by sponsors of the 1940 Act who advocated Commission regulation of water transportation that the questioned legislation unequivocally required the Commission to fix rates which would preserve for shippers the inherent advantages of barge transportation: lower cost of equipment, operation, and therefore service."

Dixie Carriers also involved section 307(d) of the Act. On shipments of sulphur from Galveston, Texas, to Danville, Illinois, the railroads had established a joint all-rail rate that was lower than either the combination all-rail rate or the combination rail-barge rate, but they refused to establish a joint rail-barge rate between the same points. The water carriers then requested the Commission to establish a through rail-barge route and a joint rate. The Commission refused. A three-judge court sustained the Commission. On appeal the Supreme Court reversed and held that the refusal of the railroads to establish joint rail-barge rates with the water carriers constituted discrimination in rates between connecting lines, in violation of section 3(4) of the Act, and that the Commission was duty bound under section 307(d) of the Act to establish through routes and joint rates for rail-barge transportation in order to effectuate the National Transportation Policy that the Act be so administered as to recognize and preserve the inherent advantages of all modes of transportation.

With respect to the legislative history of the Act, Mr. Justice Douglas said, 351 U.S. at page 59, 76 S.Ct. at page 580:

"It was recognized in the debates on the bill that became the Transportation Act of 1940 that manipulation of rail rates downward might deprive water carriers of their 'inherent advantages' and therefore violate the Act. It was emphasized that one of the evils to be remedied was cutthroat competition, whereby strong rail carriers would reduce their rates, putting water carriers out of business. There was recognition that for shippers to get the

benefit of the 'inherent advantages' of water transportation there frequently would have to be joint rail-barge rates. Barge transportation frequently covers only one segment of the journey to market. The failure of the railroads to establish nondiscriminatory joint rates with barges might, therefore, seriously impair the development of barge service as a vital component of our national transportation system. Section 3 outlaws discrimination in all its forms."

In Arrow, the Court considered a section 3(4) discrimination charge growing out of a difference in rail rates on grain having an ex-barge movement as compared with an ex-rail movement. In the illustration given by the Court, the grain could move from Kansas City to Chattanooga by either rail or barge, but from Chattanooga to Orangeburg, the movement was all-rail. If the grain came to Chattanooga by rail, it could be reshipped to Orangeburg at a lesser rate than would be charged if the grain was brought to Chattanooga by barge. This higher rate on ex-barge grain, observed the Court, destroyed the savings on the inbound barge transportation. In reversing the Commission's order on the ground that it failed to give Arrow relief as a connecting carrier, the Court reviewed the legislative history of the Transportation Act of 1940 as expressed by the Supreme Court in Mechling and Dixie Carriers, and concluded that the rationale of those cases made it clear "that Congress imposed a duty upon the Commission to eliminate discrimination in whatever guise or form it exists." The Court also understood Mechling and Dixie Carriers to teach that "carriers cannot hide their discrimination against ex-barge traffic behind the veil of a through rate any more than they can charge a higher proportional rate on ex-barge than on ex-rail traffic."

In this connection the Court, 176 F. Supp. at page 421, said:

"Whether the rates are published as proportional rates or as joint rates,

the charges paid by the shipper for the movement of ex-barge grain beyond the ports must be on a level which preserves intact the savings on the water leg of the journey, at ports where the inbound and outbound rail carriers are the same, as well as at ports where the inbound and outbound rail carriers are different. * * * We construe the Supreme Court decisions in Mechling and Dixie as making unlawful any rate-making device which deprives barge transportation of its rightful place in the National transportation system or which deprives shippers of any part of the economies resulting from the use of barge transportation."

See also James McWilliams Blue Line, Inc. v. United States, 100 F.Supp. 66 (S.D.N.Y.1951), aff'd 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707.

We next come to the case of Georgia Public Service Commission v. Bush Terminal Railroad Company, 310 I.C.C. 225. In principle, that case cannot be distinguished from the instant case. In Bush Terminal a number of railroads refused to join with Seatrain in establishing through rail-water-rail rates (on pulpboard moving by rail from St. Marys to Savannah, Georgia, thence by water in Seatrain's service to Edgewater, New Jersey, and beyond that point by rail to destinations in New York and New Jersey), differentially lower than the all-rail rates between the same points which had become effective on October 23, 1959. It was alleged by the State of Georgia and others, on complaint filed with the Commission, that this refusal by the railroads to join with Seatrain, violated a number of sections of the Act, including section 3(4). The Commission was asked to prescribe joint rail-water-rail rates differentially lower than the all-rail rates pursuant to section 307(d) of the Act, 49 U.S.C.A. § 907(d).

The evidence before the Commission in Bush Terminal indicated that the cost of service for movement over the rail-water-rail routes was somewhat higher

than that for all-rail service. On the basis of cost evidence before it and other facts of record, the Commission concluded that the prescription of joint rail-water-rail rates differentially lower than the all-rail rates was not justified. However, the Commission did grant relief under section 6(11) (b) of the Act, 49 U.S.C.A. § 6(11) (b). The through all-rail rates having been reduced by 30 per cent on October 23, 1959, without any reduction being made in the local rail rates to and from the Seatrain ports, the Commission, at page 243, found that:

> "The failure to provide rates lower than the local rates from St. Marys to Savannah and from Edgewater to these destinations when the through rail rates were reduced by 30 percent, unlawfully discriminates against the rail-water-rail routes and is contrary to the provision against unfair or destructive competitive practices in the national transportation policy. Considering the extensive port-to-port water haul, rates lower than the local rates on rail traffic terminating at the ports are warranted. Under section 6(11) (b) of the act, we are empowered to require the establishment of proportional rates by rail to and from the ports to which traffic is brought, or from which it is taken by the water carrier. We find that the defendants should establish proportional rates, minimum 80,000 pounds, of 17.5 cents on pulpboard from St. Marys to Savannah for delivery to Seatrain, and 11 cents on pulpboard from Edgewater to the destinations named in the complaint on traffic received from Seatrain at that port which represents a rate reduction of approximately 30 percent, and that failure to establish such rates will be unjust and unreasonable under section 1 and discriminatory under section 3(4) of the act."

The Commission maintains in this case that it was not necessary to make a section 3(4) finding in Bush Terminal, and that its action "in requiring the establishment of proportional rates to and from the ports involved should have been based solely upon the finding that the reduction in the all-rail rates without a corresponding reduction in the local rates to and from the ports was an unfair and destructive competitive practice within the meaning of the national transportation policy." The Commission then concludes that "there is no basis for finding here that the proposed all-rail rates constitute an unfair or destructive competitive practice."

Seatrain does not quarrel with the Commission's finding that the all-rail rate, because it exceeds fully distributed costs, does not constitute destructive competition. Interstate Commerce Commission v. New York, New Haven & Hartford Railroad Co., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963). Seatrain's complaint in this case is directed to the Commission's finding of no discrimination under section 3(4) of the Act. In Bush Terminal, as noted earlier, the record indicated that the cost of rail-water-rail service was higher than all-rail service. Here the reverse is true. Seatrain was found to be the low-cost mode of transportation, and the rail-water-rail route the low-cost route. Here, as in Bush Terminal, both the all-rail and rail-water-rail rates were before the Commission for consideration on a relative basis. We have already mentioned the relief granted in Bush Terminal. And yet in the case at bar Seatrain, with a better showing, on a cost basis, than existed in Bush Terminal, is denied relief.

In our opinion, the disparities established by Seatrain in this case with respect to rates, costs, and divisions of revenue, are of sufficient magnitude to make out a prima facie case of discrimination. The Commission's overall conclusion based, as we have seen, on lack of identification of the discriminating railroads and dissimilarity of transportation conditions, is not adequately supported by the evidence of record. A prima facie case having been made out by Seatrain, it was incumbent upon the railroads to show such a dissimilarity of

transportation conditions as would warrant the rate treatment accorded them in this case. This they failed to do.

We might also mention in passing a matter called to our attention at oral argument, although no reference thereto is made in the record or in the argument before the Commission. Paragraph 7 of Seatrain's amended complaint, after reciting that the rail rate from Sandow to Texas City "was and continues to be 44 cents per hundred pounds", alleged that "a rate of 29 cents per hundred pounds (actually published as $5.80 per short ton) is available for movement to Texas City when the aluminum articles are exported to a foreign country by water." The Commission's answer "neither admits nor denies, for lack of information" the allegations respecting the 29 cent rate. Counsel for the Commission professed to have no knowledge of this export rate, but counsel for Seatrain argued that the 29 cent rate was published in a tariff on file with the Commission, and that the Commission is required to take official notice of the tariffs on file. We have not considered this 29 cent rate in reaching our decision in this case. It may be that special tariffs cover exports to a foreign country and that the 29 cent export rate has no relevancy to the section 3(4) issue.

We appreciate that it is not for us to prescribe the manner in which the discrimination we have found to exist in this case should be eliminated. In Bush Terminal proportional rates were prescribed under section 6(11) (b) of the Act. Whether that should be done in in this case or whether some other form of relief should be granted, we leave to the expertise of the Commission.

The order of the Commission on the section 3(4) issue of discrimination is set aside, and the matter is remanded to the Commission for further proceedings consistent with this opinion.

Counsel for plaintiff Seatrain Lines, Inc. shall submit, on notice to counsel for all other parties, an appropriate order.