568 F.2d 887
 STATE OF NEW YORK, Petitioner,
and
S & E Shipping Corporation, Intervenor,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
and
Commonwealth of Pennsylvania et al., Intervenors.
 No. 212, Docket 76-4085.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 8, 1976.
Decided March 2, 1977.
Rehearing Denied June 6, 1977.
Rehearing En Banc Denied June 6, 1977.
 
 Patrick McEligot, Washington, D. C. (Louis A. Lefkowitz, Atty. Gen., Ruth Kessler Toch, Solicitor Gen., State of New York, Albany, N. Y., Bryce Rea, Jr., Leo C. Franey, and Rea, Cross & Knebel, Washington, D. C., on the brief), for petitioner State of New York.
 Robert J. Ables, Washington, D. C. (Arthur N. Chagaris, Washington, D. C., on the brief), for intervenor S & E Shipping Corp.
 Hanford O'Hara, Assoc. Gen. Counsel, I.C.C., Washington, D. C. (Thomas E. Kauper, Asst. Atty. Gen., Lloyd John Osborn, Atty., Dept. of Justice; Robert S. Burk, Acting Gen. Counsel, I.C.C., Washington, D. C., on the brief), for respondents United States and Interstate Commerce Commission.
 C. Harold Peterson, Minneapolis, Minn., and Peter A. Greene, Washington, D. C. (Louis A. H. Pepper, New York City, on the brief), for intervenors Soo Line Railroad Co. and ConAgra, Inc.
 Robert P. Kane, Atty. Gen., Commonwealth of Pennsylvania; Edward J. Morris, Counsel, John B. Wilson, Asst. Counsel, Pennsylvania Public Utility Commission, Harrisburg, Pa.; Gordon P. MacDougall, Spec. Asst. Counsel, Washington, D. C., filed a brief for intervenors Commonwealth of Pennsylvania and Pennsylvania Public Utility Commission.
 Before HAYS, ANDERSON and TIMBERS, Circuit Judges.*
 TIMBERS, Circuit Judge:
 
 
 1
 On this petition to review, petitioner State of New York (New York) challenges an order of the Interstate Commerce Commission (the Commission), 351 I.C.C. 470 (1976),[1] which approved certain "unit train rates" of two railroads for the transportation of wheat from points in the midwest to Martins Creek, Pennsylvania.
 
 
 2
 The essential questions presented by the petition to review are (1) whether the Commission's order failed to protect certain lake carriers against allegedly discriminatory and prejudicial rail rates in violation of § 3(4) of the Interstate Commerce Act (the Act);[2] and (2) whether the Commission's order failed to protect the lake carriers, the Port of Buffalo and other Buffalo interests against such rail rates which allegedly would divert wheat traffic away from Buffalo in violation of § 3(1) of the Act.[3] A further question with respect to this Court's jurisdiction is raised by respondents' motion partially to dismiss the petition to review for lack of timeliness.
 
 
 3
 For the reasons below, we hold that we have jurisdiction to review the order of the Commission; we affirm the Commission's order that the proposed rates do not violate § 3(1) of the Act; but, with respect to the § 3(4) claim, we set aside the order and remand the case to the Commission for the limited purpose of determining whether the proposed rates discriminate against the lake carriers as connecting lines.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 4
 After the Commission's initial report and order of June 18, 1974, 346 I.C.C. 814 (1974), the State of New York was granted leave to intervene to consolidate and represent various New York interests which had opposed the proposed rates in question. New York's position on the instant petition to review is supported by intervenor S&E Shipping Corporation.
 
 
 5
 Respondents are the United States and the Commission. Their position is supported by intervenors Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Soo Line Railroad Company (Soo) and ConAgra, Incorporated (ConAgra). Soo and Erie Lackawanna Railway Company (Erie), supported by ConAgra, were the original proponents of the proposed rates.[4]
 
 
 6
 The proceedings before the Commission involved proposed unit train rates[5] on wheat transported in bulk over an all rail route from Minneapolis and St. Paul, Minnesota (Twin Cities) and Duluth, Minnesota, and Superior, Wisconsin (Twin Ports), to Martins Creek, Pennsylvania. The shipper, ConAgra, has its mill at Martins Creek.[6]
 
 
 7
 The following straight line diagram shows the rail routes as well as the lake route referred to below:
 
 
 8
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 9
 The proposed rates are summer and winter rates from Twin Ports and Twin Cities to Martins Creek. Soo carries the wheat from the points of origin to Chicago. Erie carries the wheat from Chicago to Martins Creek.
 
 
 10
 The summer rate from each point of origin (72.25 cents per hundredweight) is the lower rate. It applies during the season when the Great Lakes are open to navigation by lake carriers. It is designed to compete with rates on the lake-rail route from Twin Ports to Buffalo by lake carrier and thence by rail to Martins Creek.
 
 
 11
 The winter rate is higher (88 cents per hundredweight). It applies only during the season when the Great Lakes are closed to navigation. It is designed to compete with rates on an all rail route, used by shippers when the Great Lakes are closed, from Twin Ports and Twin Cities via Buffalo to Martins Creek.
 
 
 12
 The proposed rates were protested by various shipper, port, carrier, and community interests.[7] By an order dated October 31, 1973, the Commission instituted an investigation of the lawfulness of the rates and suspended their operation through May 31, 1974. The Commission's initial order of June 18, 1974, 346 I.C.C. 814, found the summer and winter rates from Twin Ports and the winter rate from Twin Cities to be lawful; but it found the summer rate from Twin Cities to be unduly preferential to Twin Cities and unduly prejudicial to Twin Ports in violation of § 3(1) of the Act.[8]
 
 
 13
 Following the Commission's initial order, New York was granted leave to intervene as stated above. Both sides thereupon filed petitions for reconsideration. On June 27, 1975, the Commission denied reconsideration of its order with respect to the three rates it had approved; but it granted reconsideration of its order with respect to the unlawfulness of the Twin Cities summer rate and "reopened (the proceeding) on the present record." Meanwhile, all four rates remained in effect. Upon reconsideration, the Commission issued its final order of January 27, 1976, 351 I.C.C. 470, affirming the lawfulness of the three approved rates and reversing its prior finding that the Twin Cities summer rate was unlawful. In short, all rates were approved and the investigation was discontinued.
 
 
 14
 It is the Commission's final order of January 27, 1976 to which the instant petition to review is addressed, invoking the jurisdiction of this Court under 28 U.S.C. § 2342(5) (Supp. V., 1975), amending 28 U.S.C. § 2343 (1970). New York seeks to have the summer and winter rates from both Twin Ports and Twin Cities declared unlawful on the ground that they violate §§ 3(1) and 3(4) of the Act.
 
 II. JURISDICTION
 
 15
 Before turning to the merits of the petition to review, we are presented with a threshold question with respect to this Court's jurisdiction. The Commission and intervenors Soo and ConAgra (referred to as "respondents" in this section of our opinion) claim that, because of the asserted lack of timeliness of the petition to review, we have jurisdiction to review only the Twin Cities summer rate, not the other three rates. We disagree.
 
 
 16
 It is common ground that a petition to review a final order of the Commission must be filed within sixty days of the entry of the order, 28 U.S.C. § 2344 (1970), and the timeliness requirement is jurisdictional. See, e. g., Microwave Communications, Inc. v. FCC, 515 F.2d 385, 389 & n. 24 (D.C. Cir. 1974).
 
 
 17
 Respondents argue that the sixty day period began to run on August 5, 1975, the date of service of the Commission's June 27, 1975 order. That order denied petitioners' request for reconsideration of the Commission's initial decision of June 18, 1974 which approved three of the four rates here in question. Respondents contend that the denial of reconsideration was a final order with respect to the three rates which earlier had been approved, in that the denial of reconsideration "impose(d) an obligation, den(ied) a right, or fix(ed) some legal relationship as a consummation of the administrative process." C & S Air Lines v. Waterman Corp., 333 U.S. 104, 113 (1948); see Isbrandtsen Co. v. United States, 211 F.2d 51, 55 (D.C. Cir.), cert. denied sub nom. Federal Maritime Board v. United States, 347 U.S. 990 (1954). Respondents stress particularly that "a final order need not necessarily be the very last order." Isbrandtsen Co. v. United States, supra,211 F.2d at 55.
 
 
 18
 Respondents' argument would be persuasive if all the petitions for reconsideration had been denied in all respects. Respondents contend that the order of June 27, 1975 terminated the proceedings as to all but the Twin Cities summer rate as completely as if the Commission had not agreed to reconsider that rate. Whatever might be said as to this theoretical contention, it wholly ignores the essential nature of the proceedings. The rates were proposed as an interrelated set of rates, not as independent tariffs. Although the Commission denied reconsideration of the three rates previously approved and granted reconsideration of the one previously disapproved, all four rates continued in effect pending reconsideration. The rate initially found to be unlawful was not cancelled, and new schedules were not filed.
 
 
 19
 Moreover, the Commission itself seems to have viewed the proceeding as still pending as a whole, notwithstanding its denial of reconsideration. In its final report and order of January 27, 1976, it discussed all the rates and affirmed and adopted the conclusions previously made with respect to the three rates as to which reconsideration technically had been denied. This was necessary because the Twin Cities summer rate was tied to the Twin Ports summer rate.[9]
 
 
 20
 As a practical matter, it would have been judicially imprudent for us as a reviewing court to consider piecemeal the initial order while the proceeding as a whole remained pending before the Commission. Indeed the Commission acknowledges in its brief before us that "(s)hould a court action be commenced under these circumstances, the Court could, in its discretion, decide to stay proceedings pending completion of the ancillary administrative proceedings." That hardly comports with our view of finality.
 
 
 21
 Even assuming that petitioners could have filed a petition to review the order approving three of the four rates immediately after denial of their petition for reconsideration, a point upon which we express no view, we are satisfied that they were justified in awaiting the outcome of the proceeding as a whole. Respondents have not shown that they were prejudiced by the passage of time. Especially in view of the deeply rooted policies of the federal courts against piecemeal appeals and in favor of allowing administrative proceedings to run their course without interference from the courts, we hold that the instant petition to review was timely with respect to the four rates in question.[10]III. SECTION 3(4) CLAIM
 
 
 22
 Turning to the merits of the petition to review, we shall consider first the claim that the Commission's order failed to protect certain lake carriers against allegedly discriminatory and prejudicial rail rates in violation of § 3(4) of the Act.[11]
 
 
 23
 Section 3(4) prohibits carriers from "discriminat(ing) in their rates, fares, and charges between connecting lines. . . ." The term "connecting line" as used here means "the connecting line of any carrier subject to the provisions of (part I) or any common carrier by water subject to (part III)."
 
 
 24
 The Commission did not reach the question whether the proposed unit train rates discriminate against the lake carriers because it found that the lake carriers are not entitled to the protection of § 3(4). 346 I.C.C. at 852. The Commission ruled that the lake carriers are outside the scope of the protection of § 3(4) because "(s)o far as the record shows, protestant's members are not regulated carriers and, therefore, not entitled to protection under section 3(4)." The Commission also ruled that the lake carriers are not "connecting lines" within the meaning of the statute.
 
 
 25
 We hold that the Commission erred with respect to both branches of its § 3(4) ruling.[12]
 
 
 26
 (A) Exempt Water Carriers Are Entitled to Section 3(4) Protection
 
 
 27
 The basis of the Commission's ruling on this issue is unclear. Its ruling and supporting reasoning is confined to the following two sentences:
 
 
 28
 "Insofar as is pertinent to the issues in this proceeding, a connecting line is defined as a common carrier by water subject to part III of the act. So far as the record shows, protestant's members are not regulated carriers and, therefore, not entitled to protection under section 3(4)." 346 I.C.C. at 852.
 
 
 29
 Intervenor Soo, in its brief before us, argues that the Commission meant that there was no evidence in the record that the protesting lake carriers are subject to part III of the Act. The Commission, however, was fully aware that some water carriers on the Great Lakes are subject to Part III.[13]
 
 
 30
 We interpret the Commission's ruling on this issue to mean that carriers exempted from regulation when they carry commodities in bulk[14] are not "subject to part III" for purposes of protection under § 3(4). We disagree. Just because a water carrier is exempt from regulation when it transports commodities in bulk does not mean that it is not subject to part III.[15]
 
 
 31
 We hold that the water carriers here involved on the Great Lakes are entitled to the protection of § 3(4) although their carriage of wheat in bulk exempts them from regulation under § 303(b) of the Act. See ICC v. Mechling,330 U.S. 567, 576 (1947) (Black, J.); ICC v. Inland Waterways Corp., 319 U.S. 671, 697 (1943) (Black, J., dissenting) (an earlier proceeding which eventually led to the Mechling decision); Valley Line Co. v. United States,390 F.Supp. 435, 438-39 (W.D.Pa.1975) (three-judge court); Seatrain Lines, Inc. v. United States, 233 F.Supp. 199, 210 (D.N.J.1964) (three-judge court); Atchison, Topeka & Santa Fe Ry. v. United States, 194 F.Supp. 438 (D.Kan.1961) (three-judge court); Arrow Transportation Co. v. United States,176 F.Supp. 411, 419 (N.D.Ala.1959) (three-judge court), aff'd sub nom. State Corporation Commission v. Arrow Transportation Co., 361 U.S. 353 (1960) (per curiam).[16](B) Meaning of "Connecting Line"
 
 
 32
 The Commission ruled that, even if protestants were entitled to the protection of § 3(4), there would be no merit to their argument. The Commission went on to state, "Section 3(4) is designed to discourage unequal treatment of connecting carriers at a given point. The proposed all-rail route passes well south of Buffalo and Erie does not extend unequal treatment at Buffalo as between carriers." 346 I.C.C. at 852. In its brief before us, the Commission supplemented this with the following explanation: "The all-rail route here involved does not reach Buffalo, the point at which New York says its connection within the meaning of section 3(4) takes place. The fact that Erie serves Buffalo on other routes does not change this conclusion." We disagree.
 
 
 33
 Respondents concede that a common point of interchange is not a prerequisite to the applicability of § 3(4).[17] Rather, they argue that somewhere along the all rail route there must be a point of interchange with the water carrier. In other words, so the argument goes, the point need not be the same as the point of interchange with a connecting rail line, but the respective rail and water interchanges at least must be located on the same route. We decline the invitation to adopt this construction of the statute. Respondents have not cited any authority for their interpretation. Petitioner's interpretation, on the other hand, finds persuasive support in Seatrain Lines, Inc. v. United States, supra,[18] and in the Commission's own decision in Ingot Molds, Ohio & Pa. to Cypress, Texas, 349 I.C.C. 102 (1975).[19]
 
 
 34
 We hold, on the facts of this case, that the lake carriers are connecting lines, because they serve a point also served by the railroad so that interchange at that point can be, and in fact is, effected. See note 19 supra.
 
 
 35
 (C) Discriminatory Rates
 
 
 36
 The Commission, having decided that the lake carriers are not "connecting lines" within the meaning of § 3(4), and that they would not be protected by that section even if they were, did not reach the question whether the rates were discriminatory.[20] We therefore remand the case to the Commission for the limited purpose of determining whether the proposed rates discriminate against the lake carriers as connecting lines.
 
 IV. SECTION 3(1) CLAIM
 
 37
 Petitioner claims that the Commission erred in failing to protect the lake carriers, the Port of Buffalo and other Buffalo interests from prejudicial and discriminatory rail rates and practices allegedly designed to divert wheat traffic away from Buffalo in violation of § 3(1) of the Act. Petitioner's argument in support of this claim is in two branches, one of which we decline to rule upon because it was not presented to the Commission, and the other we reject on the merits.
 
 
 38
 (A) Prejudice to Water Carriers
 
 
 39
 This branch of petitioner's § 3(1) argument (upon which we decline to rule) is based on the same facts which it urged in support of its claim of discrimination against the lake carriers under § 3(4). See note 20, supra. Here New York argues, on behalf of the lake carriers, that Erie's failure to provide a unit train rate from Buffalo to Martins Creek is prejudicial to the lake carriers in violation of § 3(1). Primary reliance is placed on Lake Carriers' Association v. United States, 399 F.Supp. 386 (N.D.Ohio 1975) (three-judge court).
 
 
 40
 This branch of petitioner's argument was not presented to the Commission for consideration in connection with its initial order or its order on any of the petitions for reconsideration. It appears to have been raised before us as an afterthought. In contrast to what we have said above regarding the § 3(4) claim and in contrast to what was said in the Lake Carriers' case, 399 F.Supp. at 395-96, we decline to rule upon that issue here. The Supreme Court has admonished that "(a) reviewing court usurps the agency's functions when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action." Unemployment Compensation Commission v. Aragan, 329 U.S. 143, 155 (1946). We find no exceptional circumstances which would impel us to consider the issue here despite the failure to present it to the Commission.
 
 
 41
 (B) Prejudice to Buffalo Shippers
 
 
 42
 As the other branch of its § 3(1) argument, New York argues, as did the Buffalo flour milling interests in the proceedings before the Commission, that they are unduly prejudiced while ConAgra is unduly preferred by Erie's failure to publish a unit train rate from Twin Ports and Twin Cities to Buffalo that is competitive with the open season lake rates. The rate Erie makes available to ConAgra during the open season is water-competitive. Petitioner argues that the Buffalo shippers are prejudiced because the open season unit train rate available to them is higher than, and therefore not competitive with, the lake vessel rate (43cents as opposed to 26.67cents). Petitioner contends that equal treatment requires that open season water-competitive rates be available to Buffalo as well as to Martins Creek.[21]
 
 
 43
 The requisite elements of a § 3(1) violation have been stated succinctly as follows:
 
 
 44
 "(I)t must be shown (1) that there is a disparity in rates, (2) that the complaining party is competitively injured, actually or potentially, (3) that the carriers are the common source of both the allegedly prejudicial and preferential treatment, and (4) that the disparity in rates is not justified by transportation conditions. The complaining party has the burden of proving the presence of the first three factors and the carriers have the burden of justifying the disparity, if possible, in connection with the fourth factor." Chicago & Eastern Ill. R.R. v. United States, 384 F.Supp. 298, 300-01 (N.D.Ill.1974) (three-judge court) (per curiam), aff'd mem., 421 U.S. 956 (1975).
 
 
 45
 See Louis Dreyfus Corp. v. United States, 401 F.Supp. 919, 926-27 & n.4 (S.D.N.Y.1975) (three-judge court).
 
 
 46
 On the facts of this case we find petitioner's claim to be particularly weak. The 72.25cents open season unit train rate to Martins Creek is about 68% Higher than the 43cents unit train rate which is available to Buffalo shippers. The rail distances from the origins to Martins Creek exceed the rail distances to Buffalo by slightly over 200 miles or about 20%. The unit train rate to Buffalo therefore is less expensive per mile than the unit train rate to Martins Creek. Furthermore, Buffalo has available to it the original water rate with which the all rail rate from Twin Ports and Twin Cities to Martins Creek is intended to compete. Petitioner nevertheless contends that the availability of a water-competitive all rail rate to Martins Creek gives ConAgra an undue advantage over the Buffalo mills because Martins Creek will have two alternative means of transportation from which to choose.[22] The Commission rejected petitioner's claims as speculative. We agree.
 
 
 47
 We hold that petitioner has not shown a disparity in rates; nor has it shown that it will be injured by the unavailability of an open season water-competitive unit train rate to Buffalo.
 
 To summarize:
 
 48
 We grant the petition to review; we affirm the Commission's order that the proposed rates do not violate § 3(1) of the Act; but, with respect to the § 3(4) claim, we set aside the order and remand the case to the Commission for the limited purpose of determining whether the proposed rates discriminate against the lake carriers as connecting lines.
 
 
 
 *
 Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Anderson and Timbers who are in agreement on this opinion. Judge Hays heard argument on November 8, 1976, but has not had an opportunity to participate further in the case because of temporary illness
 
 
 [1]
 The Commission's final order of January 27, 1976, 351 I.C.C. 470, which is the subject of the instant petition to review, as well as the Commission's initial order of June 18, 1974, 346 I.C.C. 814, were both entered in the Commission's Investigation and Suspension Docket No. 8899, Unit Train Rates on Wheat, Minn. & Wis. To Martins Creek, Pa
 Both orders were entered by Division 2 of the Commission. The final order was entered by Division 2 acting as an Appellate Division. In the interest of brevity we refer throughout this opinion to "the Commission", unless otherwise specified.
 
 
 [2]
 Section 3(4) of the Interstate Commerce Act, 49 U.S.C. § 3(4) (1970), provides:
 "All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this chapter or any common carrier by water subject to chapter 12 of this title."
 
 
 [3]
 Section 3(1) of the Interstate Commerce Act, 49 U.S.C. § 3(1) (1970), provides:
 "It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."
 
 
 [4]
 The rates went into effect on June 1, 1974. By the time of the Commission's initial decision, the rates had increased. For convenience the Commission continued to refer to the rates as "proposed" even though they were in effect and it used the figures applicable to the rates as originally proposed. 346 I.C.C. at 815-16. We shall do the same in this opinion
 
 
 [5]
 Unit train rates generally "provide for the movement of a train comprised of shipper or consignee owned cars from one specified loading point to one consignee at one specified destination, and the return of the empty cars to the same origin at a specified rate per ton." Lake Carriers' Association v. United States, 399 F.Supp. 386, 388-89 (N.D. Ohio 1975). Unit train rates are to be distinguished from trainload and carload rates. The unit train system is a form of shuttle, here between the midwest loading points and the shipper's plant at Martins Creek. The cars in this case are not owned by the shipper, ConAgra, but by Soo
 
 
 [6]
 ConAgra seems to be regarded as something of an upstart by the milling industry for locating its operation at Martins Creek rather than at Buffalo, which is considered the milling capital of the East. ConAgra chose to locate at Martins Creek in order to be closer to the bakeries in the East Coast markets in New York, New Jersey and Pennsylvania. It is to these markets that ConAgra ships its flour by motor carrier and the Buffalo millers ship their flour by rail
 
 
 [7]
 The protestants included, among others, lake carriers, milling companies, groups representing various Buffalo interests, and the Penn Central Transportation Company
 
 
 [8]
 The Commission found the Twin Cities summer rate unlawful because it was the same as the Twin Ports summer rate (72.25 cents) and did not include the cost of transporting wheat from Twin Cities to Twin Ports. The latter cost would make transportation from Twin Cities more expensive if the wheat were being transported by lake carrier to Buffalo. The Commission held that the parity of rates between Twin Ports and Twin Cities, during the season when the rail rates were supposed to be competitive with lake rates, was unduly preferential to Twin Cities and unduly prejudicial to Twin Ports in violation of § 3(1). "A lawful rate from the preferred origins would be 88 cents which is substantially the product (sic) of the local 15-cent rate from Twin Cities to Twin Ports and the proposed 72.25 cent rate beyond." 346 I.C.C. at 855
 
 
 [9]
 Under § 17(7) of the Interstate Commerce Act, 49 U.S.C. § 17(7) (1970), an appellate division of the Commission is empowered to reverse, change, or modify the original decision "in any respect". The appellate division apparently is not limited to the issues on which reconsideration was granted. The Commission can exercise "continuing jurisdiction to suspend, reconsider or modify its orders . . . even in the absence of a petition for reconsideration . . . ." Resort Bus Lines, Inc. v. ICC, 264 F.Supp. 742, 745 (S.D.N.Y.1967) (three-judge court) (Kaufman, J.)
 This power to reconsider the entire record is exemplified by the proceedings below. In its final report and order, the Commission discussed the Twin Ports rates as well as the Twin Cities summer rate. It identified the rates in issue as those from Twin Ports and Twin Cities at both the summer and winter levels, recited the arguments against all the rates, and specifically adopted the prior findings and conclusions as to the Twin Ports rates in order to extend them to the Twin Cities summer rate. 351 I.C.C. at 471, 473, 478-79. In conclusion it stated: "Upon reconsideration, we find the proposed unit-train rates from Twin Ports and Twin Cities to Martins Creek to be just and reasonable and not otherwise unlawful." Id. at 479. Despite its earlier denial of reconsideration, the Commission appears to have reconsidered all four rates.
 
 
 [10]
 By analogy, a grant of summary judgment as to fewer than all claims or parties is not a final, appealable judgment unless the district judge determines that there is "no just reason for delay" pursuant to Fed.R.Civ.P. 54(b). See, e. g., Melancon v. Insurance Co. of North America, 476 F.2d 594 (5 Cir. 1973) (per curiam); 9 Moore's Federal Practice P 110.07, at 108 n. 6 (Supp.1975)
 We see no reason to encourage the filing of "protective" petitions for judicial review at various points preceding completion of administrative proceedings. See generally Outland v. CAB, 284 F.2d 224, 228 (D.C. Cir. 1960).
 
 
 [11]
 We reject respondents' contention that this issue is not properly before us. Although neither New York nor the Lake Carriers' Association (one of the original protestants) included this claim in their petitions for reconsideration, that does not preclude our review of the issue under United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 36-37 (1952). In Tucker the point urged on review had never been presented to the administrative agency. Here the question whether the proposed rates are unlawful under § 3(4) was presented to the Commission and was expressly ruled upon in the initial decision of June 18, 1974. 346 I.C.C. at 852. We have the benefit of the Commission's views on the issue. See Great Falls Community TV Cable Co. v. FCC, 416 F.2d 238, 239 (9 Cir. 1969); Lake Carriers' Association v. United States, supra, 399 F.Supp. at 395-96. Under the circumstances, and especially since a petition for reconsideration by the agency is not a prerequisite to judicial review, § 704 of the Administrative Procedure Act, 5 U.S.C. § 704 (1970), we shall consider the issue
 
 
 [12]
 Respondents now suggest a third ground for denying the lake carriers the protection of § 3(4), namely, that the proposed rates are not covered by that section because the traffic is "specifically routed" to the all rail route by the shipper, ConAgra, and therefore comes within the statute's exception for specifically routed traffic. Aside from being a post hoc rationalization for agency action, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962), the argument misinterprets the statutory language. The shipper routing exception to § 3(4) is designed to protect a railroad against charges of undue prejudice when its reason for not giving certain traffic to a particular connecting line is that it is following a shipper's instructions to route the traffic to another connecting line. The exception does not provide a defense to a charge of rate discrimination. Were this not so, § 3(4) would be a dead letter, for shippers obviously would be willing to route traffic in order to avail themselves of lower rail rates
 
 
 [13]
 Included in the Certified Index to the Record is the protest originally filed on behalf of the Great Lakes Ship Owners Association and its individual members. Its opening sentence identifies the protestants as "common carriers by water holding certificates of public convenience and necessity issued under Part III of the Interstate Commerce Act . . . ." The Commission's own public records show that certificates were issued to the non-exempt carriers. Also included in the Certified Index to the Record is the protest of the Lake Carriers' Association, one of whose members is shown by the Commission's records to hold a certificate. Under these circumstances and in view of the importance of navigation on the Great Lakes, we cannot assume that the Commission was unaware that there are water carriers on the Great Lakes subject to Part III
 
 
 [14]
 Section 303(b) of the Interstate Commerce Act, 49 U.S.C. § 903(b) (1970), in relevant part provides:
 "Nothing in this chapter (Part III of the Interstate Commerce Act, 49 U.S.C. §§ 901-23) shall apply to the transportation by a water carrier of commodities in bulk . . . ."
 
 
 [15]
 The Commission asserts in its brief that "(t)he only connecting carriers are Great Lakes water carriers which are not subject to Part III" and that "(t)his point is vigorously confirmed by S&E Shipping in its brief to this Court." What we find confirmed in S&E Shipping's brief is that the Commission cannot regulate water carriers carrying commodities in bulk; and that the Commission repeatedly has sought repeal of the § 303(b) exemption, but not that this removes such water carriers from the protection of § 3(4)
 
 
 [16]
 Of these cases, only Valley Line explicitly discusses the issue. The question there was whether exemption from the terms of part III under § 303(e) of the Act, 49 U.S.C. § 903(e)(1), makes a carrier not "subject to part III" within the meaning of § 5(2) of the Act, 49 U.S.C. § 5(2), which, like § 3(4), is in part I of the Act. Valley Line held that a water carrier exempt from part III nevertheless is entitled to the protection of § 5(2), "relating to protection of the public interest with respect to mergers and concentration of control over carriers . . . ." 390 F.Supp. at 438. The court reasoned that, although the terms of § 5(2), as defined in § 5(13), 49 U.S.C. § 5(13), protect water carriers "subject to chapter 12 of this title (part III of the Act)", exemption from part III does not mandate exclusion from the protection of § 5(2) because the policies of part I "are of general importance, and quite distinct from the specific regulatory requirements with respect to water carriers established by part III. . . ."
 While the other cases cited do not discuss the issue expressly, in all of them except the Inland Waterways/Mechling cases the courts applied § 3(4) to invalidate rail rates that discriminated against water carriers transporting commodities in bulk. The bulk commodity in all the cases except Seatrain was grain.
 Mechling was decided under § 307(d) of the Act, 49 U.S.C. § 907(d) (1970). But in a general discussion of the legislative history of the Transportation Act of 1940, which added part III to the Act and extended § 3(4) to water carriers, the Court noted by way of dictum that " § 3(4) of the pre-existing Act . . . was amended by the 1940 Act specifically to include water carriers, such as these barge lines, within the definition of connecting carriers." 330 U.S. at 576. As in the instant case, the barge lines in Mechling carried grain in bulk and therefore would have been exempted from part III. Mr. Justice Black, in his dissenting opinion in the earlier proceeding (Inland Waterways ), stated that § 3(4) had been violated. 319 U.S. at 671.
 
 
 [17]
 To the extent that language in Western Pacific Rys. v. United States, 382 U.S. 237, 245-46 (1965), is to the contrary, we believe it can be explained by the particular facts and the concerns of the parties in that case. In Western Pacific, an intermediate carrier on a through route complained under § 3(4) of discrimination by a railroad with which the complainant did not connect physically. Another railroad which had not complained linked the complainant to the allegedly discriminating railroad. The Court rejected the Commission's narrow construction which would have required a complainant itself to "make a direct connection with the discriminating carrier, or be part of a through route that already includes the carrier." 382 U.S. at 242. In order to make plain that the facts of that case satisfied the requirements of § 3(4), the Court held "that to qualify as a 'connecting line', in the absence of physical connection, a carrier need only show that it participates in an established through route, making connection at the point of common interchange, all of whose participants stand willing to cooperate in the arrangements necessary to eliminate the alleged discrimination." Id. at 245 (emphasis added). The holding simply described the facts of the case and declared them to be sufficient to qualify the complainant as a "connecting line"
 In the instant case there is a direct physical connection at Buffalo between the lake carriers and Erie. The Court's language about a point of common interchange, referring to the through route of which the non-connecting carrier in Western Pacific was a part, is inapplicable to this case, as respondents concede. Indeed, Western Pacific stands for the proposition that the term "connecting lines" in § 3(4) should not be construed restrictively.
 
 
 [18]
 In Seatrain the all rail route originated at Sandow, Texas. It had connections with other rail lines at Marjorie, Texas; Longview, Texas; Texarkana, Arkansas; and one of three alternate gateways to the East (St. Louis, Mo.; East St. Louis, Ill.; or Flinton, Ill.). It finally arrived at the shipper's aluminum fabricating plants at Cressona, Pa
 The rail-water-rail route also originated at Sandow, Texas, and arrived ultimately at Cressona, Pa. The first rail link was at Marjorie, Texas, as on the all rail route. Thereafter the routes diverged. The next connection was at Texas City, Texas, where the railroad cars were loaded aboard the water carrier for shipment to a port at Edgewater, New Jersey, whence they were carried by rail to Cressona.
 Thus, in Seatrain, as in the instant case, there was no point of interchange with the water carrier along the all rail route. It was sufficient that the water carrier "connected" with the rail carrier, in the common sense meaning of that word.
 
 
 [19]
 The parties sharply disagree in their interpretations of the Ingot Molds decision. There three routes were involved, two all rail and one barge-rail. There was an interchange between barge and rail lines on one of the all rail routes (at Houston, Texas) but not on the other all rail route. The Commission held that the complaining water carrier was a connecting line and that the railroads had violated § 3(4). Respondents contend that the decision was based on the fact that the barge line interchanged with the rail line on one of the all rail routes. We believe the Commission would have reached the same result had there been only the two non-intersecting routes. The decision would be pointless if it meant that the railroads could continue to maintain discriminatory rates as long as they routed traffic over the non-intersecting all rail route (via Corsicana, Texas). See diagram at 349 I.C.C. 107. The Commission itself stated that the relevant "court decisions (make clear) that a water carrier serving a point also served by a railroad is a connecting carrier within the meaning of section 3(4) of the (A)ct if interchange of traffic can be effected . . . ." Id. at 111; see also id. at 112. See generally Oil Country Iron or Steel Pipe, Midwest to Okla. & Tex., 326 I.C.C. 511 (1966), 332 I.C.C. 540 (1968), aff'd sub nom. Atchison, Topeka & Santa Fe Ry. v. United States, 300 F.Supp. 1351 (N.D.Ill.1969) (three-judge court)
 
 
 [20]
 Petitioner contends that it made out, and that the Commission's own findings indicate, 346 I.C.C. at 829, 830, a prima facie showing of a § 3(4) violation. Petitioner argues in its brief:
 "(C)ost studies accepted by the Commission showed that Erie's yield under the reduced rate on the all rail route was 18 percent of fully distributed rail costs in rail-owned cars and 14 percent in shipper-owned cars whereas Erie's yield in the rail leg of the water route was approximately four to six times higher 73 percent of fully distributed rail costs in rail-owned cars and 90 percent for shipper-owned cars. The evidence also shows that Erie would receive 40 cents to transport one hundred pounds of wheat 340 miles from Buffalo to Martins Creek but that it would receive only 47 cents per hundred pounds during the open navigation season and 57 cents per hundred pounds during the closed navigation season to transport wheat 910 miles from Chicago to Martins Creek."
 
 
 [21]
 During the closed season the unit train rate to Martins Creek is set at a level to compete with the unit train rate to Buffalo (43cents); so petitioner does not challenge the closed season rate
 
 
 [22]
 Petitioner emphasizes the importance of having an alternative when shipping on the Great Lakes is interrupted, the closed season is unusually long, or a shipper is unable to obtain needed vessels. Petitioner also argues that ConAgra will have the advantage of being able to shop for the lower transportation cost because any adjustments in rail rates to reflect changes in lake rates necessarily will not be implemented as quickly as increases in lake rates, especially because they require notice and are subject to Commission review